L. JAY WALKER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Walker v. Commissioner
Docket No. 6583-77.
United States Tax Court
T.C. Memo 1983-538; 1983 Tax Ct. Memo LEXIS 250; 46 T.C.M. (CCH) 1267; T.C.M. (RIA) 83538; August 31, 1983. *250 Petitioner was the primary target of an undercover police investigation of an illegal lottery. Based on documentation obtained through police searches, respondent determined that petitioner received unreported income from the operation of an illegal lottery during the years 1972 through 1974 in excess of $550,000; and that the resulting underpayments of tax were due to fraud so that the additions to tax for fraud were applicable. Held, based on petitioner's failure to introduce evidence controverting respondent's allegations, respondent's deficiency determinations are upheld. Held further, respondent's proof linking petitioner to illegal lottery activity is not of sufficient probative value to establish the existence of fraud by clear and convincing evidence. L. Jay Walker, pro se. J. Carlton Howard, Jr., for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated April 13, 1977, respondent determined the following deficiencies in, and additions to, petitioner's Federal income taxes: Addition to tax
Year
Deficiency
pursuant to sec. 6653(b)
1972
$155,150.02
$76,575.01
1973
122,708.70
61,354.35
1974
73,598.27
36,799.13
The issues for decision are (1) whether petitioner had unreported income from the operation of an illegal lottery during the years 1972, 1973, and 1974 in the amounts of $236,319.98, $192,448.31, and $123,880.11, respectively; and (2) whether petitioner is liable *252 for the additions to tax pursuant to section 6653(b), I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner, L. Jay Walker, resided in Harrisburg, Pennsylvania at the time of filing the petition herein. He timely filed his Federal income tax returns for the calendar years 1972, 1973, and 1974 with the Internal Revenue Service Center, Philadelphia, Pennsylvania. During the summer of 1974, the Pennsylvania State Police conducted an undercover investigation of an illegal lottery or numbers operation located within the City of Harrisburg. The primary target of this police undercover investigation was petitioner, L. Jay Walker, who was the *253 reputed head of the numbers operation. Basically a numbers game is a gambling game where participants bet on a certain number being that day's winning number. In the case of the Harrisburg game in question, the daily winning number was usually based on recetrack results. A player could play a number either "straight" or "boxed" and could bet almost any amount on a given number.If a number was played "straight" the payoff for that particular number would be anywhere from 400-to-1 to 600-to-1; however, if the number was played "boxed," meaning any combination of three digits was being played, then the payoff would be considerably lower. During the course of their investigation, the Pennsylvania State Police obtained information that they believed confirmed their suspicions that petitioner was the head of the Harrisburg numbers game. Much of this information was obtained from Thomas H. Shelar, who was an undercover trooper on the Pennsylvania State Police organized crime strike force. During the investigation, Mr. Shelar was assigned to infiltrate the Harrisburg numbers operation by placing bets. One of the places where Mr. Shelar did a large amount of undercover work was the *254 Blue Note Cafe. Mr. Shelar's daily activities there consisted of having a couple of drinks and playing a number or two with Maggie Allen, the owner or operator of the Blue Note. Within 2 or 3 days after infiltrating the Blue Note, Mr. Shelar observed Maggie Allen giving the numbers that she had taken to a man named Dick Mack. Dick Mack was a known numbers runner; that is, a person who picks up numbers from various locations and delivers them to either a "bank," a sub-bank, or another party.
The Pennsylvania State Police subsequently began a surveillance of Mr. Mack. During the course of this surveillance, Mr. Shelar observed Mr. Mack using the pay phone in the Blue Note to relay the bets taken by Maggie Allen. On one of these occasions, Mr. Shelar watched from a distance of about 15 to 20 feet as Mr. Mack dialed a phone number he thought to be 233-4477. Petitioner's phone number at that time was 234-4473. Although the numbers were not exact, Mr. Shelar suspected that the call was placed to petitioner. This suspicion was buttressed by the fact that Mr. Mack told him about a millionaire who was redecorating a bar called "The Lounge." When Mr. Shelar inquired about the identity *255 of this person, Mr. Mack replied, "The guy, he owns The Lounge and he's the head of this numbers thing." It is stipulated that at all times pertinent to this action petitioner was the titleholder of The Lounge Cafe. As a result of this undercover investigation, the police went before a district Justice of the Peace and obtained warrants to search a number of locations for numbers paraphernalia, betting slips, and related items. Among the places searched were the Blue Note Cafe, petitioner's home, The Lounge, Dick Mack's home, John L. Barbee's home, and John L. Barbee's car. Barbee's residence was believed to be the "bank" for the numbers operation. A bank is the place where all the bets on the street are collected, the money is counted, and a tally is made to make certain that the money on hand equals the amounts of bets received that day.The banker ascertains the winning number for the day and tallies how much is to be paid out on that particular number.
Among the evidence collected in the searches that followed on September 19, 1974, the police found three calendars for the years 1972, 1973, and 1974 at the residence of John L. Barbee. These calendars list numbers and numerical *256 monetary amounts for each specific day from January 1972 until September 18, 1974. On each date on the calendar three figures are entered. The top number was a dollar figure representing the net amount of money bet on the numbers for that day. This net amount is arrived at by calculating the entire amount bet and then subtracting 25 percent for commissions paid to numbers runners. The three digit number entered in the middle on each day was the winning number for that day. Finally, the bottom number on each day was a dollar figure representing the amounts paid out for winning bets. During their search of Mr. Barbee's house, the police also found several pieces of paper which contained tallies of bets placed on September 17 and September 18, 1974. These slips of paper also contained code numbers relating to the various numbers runners. Petitioner's apartment was also searched and he was arrested during a raid conducted on September 19, 1974.During the search of petitioner's residence several slips of paper were confiscated. One piece of paper contained codes and telephone numbers, one of which was for a known numbers runner. There were also other slips of paper found that *257 contained handwritten numbers along with an adding machine tape that contained a list of tallied numbers. There exists a strong correlation, although not exact, between the numbers on the slips of paper found at Mr. Barbee's residence and the numbers on the slips of paper found the same day at petitioner's residence. Petitioner was not convicted as a result of his arrest. Using the information derived from the calendars seized at Mr. Barbee's residence, respondent's agents prepared an analysis of the profits realized from the Harrisburg numbers operation during the years 1972, 1973, and 1974. In preparing this analysis, the agent checked the numbers appearing on the calendars against approximately 50 days of tally sheets found in Mr. Barbee's residence and found the numbers recorded on the calendars to be very accurate. In his statutory notice of deficiency, respondent determined that petitioner realized taxable income from bookmaking operations of $236,319.98, $192,448.31, and $123,880.11 for the years 1972, 1973, and 1974, respectively. These adjustments to income were taken from the total figures on the profit analysis prepared by respondent's agent; however, an additional *258 5-percent deduction was allowed for each year based on a prior decision of this Court. OPINION We first address the question of whether petitioner received taxable income from an illegal lottery during the years 1972, 1973, and 1974 equal to the amounts determined by respondent. This issue is purely factual and petitioner bears the burden of proving that respondent's determinations are incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
In the instant case, there is little doubt that there was an illegal lottery being run in Harrisburg during the years in question. Respondent has introduced detailed testimony and documentary evidence concerning the Pennsylvania State Police investigation of such activities during the summer of 1974 that confirms beyond a shadow of a doubt that an illegal numbers operation was indeed in existence. Furthermore, the amounts of income derived therefrom are also not subject to any serious question. Respondent has introduced evidence (the calendars themselves with the net receipts noted thereon) seized at Mr. Barbee's residence along with Mr. Barbee's testimony, which *259 establish a solid foundation for his calculations of the profits earned from the illegal numbers operation during the years in question. Thus, the sole dispute with respect to this issue is whether petitioner is the party to whose benefit the entire income in question inured. Respondent bases his case primarily on the evidence obtained by Mr. Shelar in his undercover investigation and the slips of paper seized in the subsequent search of petitioner's residence. Mr. Shelar testified that on one occasion he saw a numbers runner, Dick Mack, dial a phone number similar to petitioner's when he was phoning in bets. Although it may be reasonable to assume that the number dialed was petitioner's and that Mr. Shelar was only slightly mistaken due to the distance he was sitting from the telephone, this testimony is certainly not of a conclusive nature. Mr. Shelar also testified that Dick Mack told him about a millionaire who was redecorating The Lounge and was the same person who was the head of the numbers operation. Although it is true that petitioner was the titleholder of The Lounge Cafe, the statements made by Dick Mack to Mr. Shelar are obviously hearsay and cannot be accepted *260 for the truth of the matter asserted. Respondent nevertheless argues that the hearsay statement should be allowed to stand because of petitioner's failure to object to its admission. We disagree. Petitioner in this case was without counsel, and we refuse to hold that a pro se taxpayer has waived his rights by his failure to object to the admission of a hearsay statement. This evidence thus has no probative value with respect to the question of whether the profits in question inurred to petitioner. Undoubtedly, respondent's strongest evidence tending to show petitioner's involvement in the numbers operation is the slips of paper seized in the police search of petitioner's residence. Although the correlation between the numbers contained on these slips and the numbers on the slips of paper obtained from Mr. Barbee's residence is not exact, there are enough similarities to indicate plainly that there was some connection between petitioner and Mr. Barbee. They clearly place petitioner in the numbers business. It is not incumbent upon respondent to show that no one except petitioner received the lottery profits. Rather, it is petitioner's burden to prove that others, and not he *261 alone, shared the lottery proceeds. Gerardo v. Commissioner,552 F.2d 549, 556 (3d Cir. 1977), affg. and revg. a Memorandum Opinion of this Court. In summary, the evidence introduced by respondent does raise the obvious possibility that petitioner was the party for whose benefit the income from the numbers operation inured. Furthermore, it is petitioner and not respondent who bears the burden of proof with respect to the alleged deficiency. Petitioner has failed to introduce any evidence other than his self-serving testimony to support his case. We do not find his testimony minimizing his role in the numbers business credible. Furthermore, he has not offered to this Court any explanation with respect to why the numbers on the slips of paper obtained from his residence are so similar to the numbers found in Mr. Barbee's residence. Accordingly, because of petitioner's failure to introduce evidence controverting respondent's allegations, we uphold respondent's deficiency determination. The second issue is whether petitioner is liable for the 50-percent additions to tax for fraud prescribed in section 6653(b). *262 The existence of fraud is a question of fact to be resolved upon consideration of the entire record before us. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. in an unpublished opinion (8th Cir. 1978). Section 7454 of the Code places the burden of proving fraud on respondent, and it must be proven by clear and convincing evidence. Carter v. Campbell,264 F.2d 930, 936 (5th Cir. 1959); Green v. Commissioner,66 T.C. 538, 549 (1976). Our holding with respect to the deficiencies does not require us to find fraud with respect to the understated income. In fact, we decline to find fraud since we do not believe that respondent, by placing petitioner in the numbers game, has thereby established by the requisite clear and convincing burden of proof that petitioner committed fraud in the years before us. Respondent failed to produce any witnesses to describe the degree and extent of petitioner's involvement in the numbers operation in question. Respondent did produce one witness, John L. Barbee, who certainly should have been able to shed some light on petitioner's involvement in the Harrisburg numbers operation. However, *263 respondent inexplicably failed to ask Mr. Barbee any questions regarding his relationship with petitioner. Additionally, respondent failed to reinforce his case by offering any net worth analysis that might confirm petitioner's receipt of the large sums of money at issue in this case. In conclusion, we hold for respondent with respect to the determined deficiencies and for petitioner with respect to the assessed additions to tax for fraud. By reason of the fact that we do not find fraud, it follows that the collection of the deficiency for 1972 is barred by the statute of limitations since the statutory notice of deficiency was mailed over 3 years after the filing of the return for that year. Accordingly, Decision will be entered under Rule 155.
Footnotes
1. Since respondent mailed the statutory notice of deficiency to petitioner more than 3 years after his 1972 return was filed and has not raised the application of sec. 6501(e)(1), if we find that there was no fraud involved with the filing of such return, then the deficiency for that year is barred by the statute of limitations. Sec. 6501(a) and (c).↩