**L. Jay WALKER, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 84–5135.**

United States Court of Appeals, Third Circuit.

Argued Oct. 26, 1984.

Decided Feb. 26, 1985.

Glenn L. Archer, Jr. (argued), Asst. Atty. Gen., Michael L. Paup, Richard W. Perkins, Gayle P. Miller, Tax Div., Dept. of Justice, George M. Sellinger, I.R.S., Washington, D.C., for appellee.

James M. Orman (argued), Freedman & Lorry, P.C., Philadelphia, Pa., for appellant.

Before GIBBONS and BECKER, Circuit Judges, and KATZ, District Judge.[*]

## OPINION OF THE COURT

KATZ, District Judge.

Unreported income from illegal gambling is a frustrating problem for the tax collector. Estimates show that such income is substantial.[1] The Internal Revenue Service has sometimes overreacted by imposing arbitrary assessments.[2] The presumption of correctness which attaches to the Commissioner's assessment of a tax deficiency is, however, an important tool for recovering taxes on unreported income.[3]

---

[*] Honorable Marvin Katz, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[1] A recent study indicates that the unreported income from illegal gambling in the United States in 1982 was between 2.4 and 3.5 billion dollars. Internal Revenue Service, 1 Unreported Taxable Income from Selected Illegal Activities 108, 112 (March 31, 1983). Unreported income from numbers playing alone was estimated to be between 1.6 and 1.9 billion dollars. *Id.* at 91, 112.

[2] *See Webb v. Commissioner,* 394 F.2d 366, 373 (5th Cir.1968) ("[t]he absence of adequate tax records does not give the Commissioner carte blanche for imposing Draconian absolutes."). *See also United States v. Carson,* 560 F.2d 693, 698 (5th cir.1977) (Government's reliance on the bare presumption of correctness is a position "which would support the most arbitrary of assessments" and "does not become the government's agents...."); *Pizzarello v. United States,*

408 F.2d 579 (2d Cir.1969); *Rinieri v. Scanlon,* 254 F.Supp. 469, 474 (S.D.N.Y.1966) ("The government has acted in a fashion which can only be described as arbitrary, capricious and unconscionable.").

[3] The Supreme Court first recognized the presumption in *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933) (Commissioner's "ruling has the support of a presumption of correctness, and the petitioner has the burden of proving it wrong."). *See also* Note, *Proving a Negative—When the Taxpayer Denies Receipt,* 70 Cornell L.Rev. 141, 143–44 (1984):

Courts and commentators attribute several functions to the presumption of correctness. First, and most commonly, courts contend that the presumption sets the threshold level of the taxpayer's initial production burden. To overcome the presumption, the taxpayer must produce enough evidence to show that the determination could be erroneous. Second, the presumption fulfills the symbolic

In unreported income cases, the presumption of correctness imposes on the taxpayer the difficult burden of proving a negative, that he did not earn the income the government claims he earned. The burden usually arises, however, from the taxpayer's own failure to keep business records of transactions known only to him.[4] Nevertheless, the taxpayer's record keeping failures do not justify "a naked assessment without any foundation whatsoever." *United States v. Janis*, 428 U.S. 433, 441, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046 (1976).[5]

In *United States v. Gerardo*, 552 F.2d 549 (3d Cir.1977), this Court struck a balance between the tax collector's legitimate interest in assessing tax on illegal gambling income and the taxpayer's right to be free from oppressive and arbitrary assessments. *Gerardo* requires that the Commissioner's reliance on the presumption of correctness rest on "some evidence ... which would support an inference of the taxpayer's involvement in gambling activity during the period covered by the assessment. Without that evidentiary foundation, minimal though it may be, an assessment may not be supported even where the taxpayer is silent." *United States v. Gerardo*, 552 F.2d at 554. In *DeCavalcante v.*

*Commissioner of Internal Revenue*, 620 F.2d 23, 27 (3d Cir.1980), this Court reiterated that "the 'Commissioner [must] provide some predicate evidence connecting the taxpayer to the charged activity.' "[6]

## I.

Appellant L. Jay Walker appeals from a decision of the Tax Court upholding the Commissioner's assessment of tax deficiencies for the years 1973 and 1974. The Tax Court found that Walker derived illegal income of $192,448 in 1973 and $123,-880 in 1974 from his involvement in an illegal "numbers" operation. The tax deficiency assessed against him for 1973 was $122,708 and for 1974 was $73,598.[7] The Tax Court's factual findings are binding upon us unless clearly erroneous. *DeCavalcante v. Commissioner*, 620 F.2d at 26.

During the summer of 1974, the Pennsylvania State police conducted an undercover investigation of an illegal numbers operation in Harrisburg, Pennsylvania.[8] Part of the investigation focused on two Harrisburg cafes, the Blue Note and the Lounge. The taxpayer was the titleholder of the Lounge. An undercover policeman assigned to the investigation occasionally placed bets with the owner of the Blue

---

burden of emphasizing that the taxpayer has the burden of persuasion. A third, more substantive purpose of the presumption is to increase the quantity and quality of the evidence needed to prevail, thereby assuring that the taxpayer produces all the evidence in his or her possession.

**4.** *See Weimerskirch v. Commissioner of Internal Revenue*, 596 F.2d 358, 361 (9th Cir.1979); *Carson v. U.S.*, 560 F.2d 693, 698 (5th Cir.1977).

**5.** As Judge Goldberg put it in *Carson v. United States*, 560 F.2d 693, 696 (5th Cir.1977):

Neither tax collection in general nor wagering activities in particular ... have ever been thought wholly to excuse the government from providing some factual foundation for its assessments. The tax collector's presumption of correctness has a herculean muscularity of Goliathlike reach, but we strike an Achilles heel when we find no muscles, no tendons, no ligaments of fact.

**6.** Other Courts of Appeals have followed the *Gerardo* rationale. *See Llorente v. Commissioner*, 649 F.2d 152 (2d Cir.1981); *Griffin v. United*

*States*, 588 F.2d 521 (5th Cir.1979); *DiMauro v. United States*, 706 F.2d 882 (8th Cir.1983); and *United States v. Stonehill*, 702 F.2d 1288 (9th Cir.1983).

**7.** The Tax Court did not find that Mr. Walker had acted fraudulently and he was therefore not liable for the fifty percent addition to his tax prescribed by 26 U.S.C. § 6653(b). Because the Tax Court did not find fraud, the three year statute of limitations barred the collection of the deficiency for 1972. 26 U.S.C. § 6501.

**8.** The rules of the numbers game are extremely simple. In most instances, the player selects one or more three-digit combinations between 000 and 999, inclusive. Players bet a small amount that their number will emerge from some pseudo-random process. The bet is registered with an intermediary (variously called a writer, runner, or seller), who collects the wager and delivers it, minus a percentage fee, to a pickup man who in turn brings the collected wages to the "bank."

Unreported Taxable Income from Selected Illegal Activities, *supra* note 1, at 78.

Note Cafe. On several occasions, a numbers runner from the Harrisburg area visited the Blue Note bar, learned what bets had been placed at the bar that day and then used the telephone to report this information. On August 7, 1974, the undercover policeman watched the numbers runner dial the telephone. Observing from fifteen to twenty feet away, the investigator believed that the runner dialed the number "233–4477." Appellant Walker's number at the time was "234–4473."

On September 19, 1974, the Pennsylvania State Police executed a number of search warrants relating to their investigation. Records were seized from the taxpayer's home and from the home of John L. Barbee, who admitted at the Tax Court hearing that he was the "processor" for a numbers game.[9] Mr. Barbee was a meticulous record keeper.

The Commissioner's comparison between the records seized from Barbee and those seized from Appellant Walker is the foundation for the deficiency assessment in this case. Two types of records seized in the raid on Barbee's home were introduced into evidence at the Tax Court proceeding: calendars summarizing daily income and "tally sheets" showing the daily transactions of seventeen numbers runners. Walker's records showed the same information as Barbee's "tally sheets" for four of these seventeen runners on September 17 and 18, 1974.

The government introduced Barbee's calendars for the years 1972 through 1974.

Each Monday through Saturday on the calendars from January, 1972 through September 17, 1974 was marked with three figures: the total amount of bets collected by all runners less the runner's twenty-five percent commission; the winning number for the day; and the amount of winnings paid out for that day.

The government also introduced Mr. Barbee's "tally sheets" for September 17 and 18. From these slips of paper, Barbee derived the figures to enter on his calendar. These tally sheets contained codes identifying the seventeen numbers runners. Next to the codes, Barbee entered the amount collected by each runner less his twenty-five percent commission.[10] The tally sheets also contained the winning numbers for each day,[11] as well as the amount of each winning bet and how much the bet paid off.[12]

The State Police also seized several papers from Walker's residence. Comparing these papers with those taken from Barbee shows that Walker was involved with four of the seventeen coded runners reflected in Barbee's records for September 17 and September 18, 1974. On one handwritten slip, the number "594" was written across the top. Barbee's tally sheets and calendar show that this was the winning number for September 17. Below the winning number, four other numbers were written. These numbers correspond with the amounts Barbee recorded as collected by four numbers

---

9. As the Tax Court pointed out, Barbee was the only witness the Commissioner produced who could have shed some light on the extent of the taxpayer's involvement in the gambling operation. The government, however, "inexplicably failed to ask Mr. Barbee any questions regarding his relationship with petitioner." *Walker v. Commissioner of Internal Revenue,* 46 T.C.M. (CCH) 1267, 1270 (1983).

10. The total amount of bets collected on September 17 was $1424.01. The total on September 18 was $1360.26. These figures were entered both on Barbee's calendar and on the tally sheets for those days.

11. "594" was the winning number for the seventeenth, "841" for the eighteenth. Both numbers appear on the tally sheets. "594" is also entered

on Barbee's calendar for September 17. Barbee's calendar for September 18 contains neither the winning number nor the amount payed out to winning bettors. Apparently, Barbee did not have a chance to enter these figures before the raid on his home.

12. For instance, the September 17 tally sheet contains only one winner. One of the customers of runner "CB" bet five cents and won fifteen dollars. "$15.00" appears also on Barbee's calendar for September 17. According to Barbee's records, there were six winners on September 18 and the amount the numbers operation paid to winning bettors was $204.00.

runners on September 17.[13] On another handwritten slip seized at Walker's home, the winning number for September 18 was written. Walker's records for September 18 also tally with Barbee's records for that date in showing the collections of four of the seventeen numbers runners, as well as their payoffs to winners.[14] Comparing Walker's with Barbee's records makes clear that Walker was involved with the same four numbers runners on both September 17 and September 18.

Thus, both sets of records show a connection for two days in September between Walker and four of the seventeen numbers writers of whom Barbee kept track. The two sets of records tie Walker to Barbee's calendar only for September 17 and September 18, 1974. The records show no evidence of participation by Walker in the gambling activities for any period except these two days. The Tax Court, however, upheld the Commissioner's assessment against Walker for the total income reflected in Barbee's calendars from the beginning of 1973 through the time of the search in September, 1974.[15]

## II.

■ Although there is sufficient evidence that Walker was involved to some extent in the numbers operation on September 17 and September 18, 1974,[16] the Commissioner has failed to make a minimal evidentiary showing of Walker's involvement before those two days. Under *Gerardo* and *DeCavalcante*, the Commissioner is not entitled to the presumption of the correctness of the assessment for the period beginning January 1, 1973 and ending September 16, 1974.

This Court's holding in *Gerardo* controls. In that case, the Internal Revenue Service conducted an undercover investigation of an illegal lottery between August 5, 1966 and February 3, 1967. The investigation culminated in raids in early February, 1967 in which daily tally sheets were seized. Gerardo was subsequently convicted in New Jersey state court for conspiracy to operate a lottery between August, 1966 and February, 1967.[17] The Commissioner assessed deficiencies based on Gerardo's

---

13. One of the numbers is off by one digit. Next to this number on Walker's slip, however, "1" is written and circled. There were no winners on September 17 among the bettors who played with the four runners on Walker's records.

14. Two other pieces of paper were seized at Walker's residence. One, the tape from an adding machine, contained some of the same numbers that appear in the handwritten slips. There is no other correlation between this tape and Barbee's records. The other piece of paper is a three-by-five card on which was written the codes for two numbers runners ("B1" and "J"). A telephone number appeared beside each code. These codes correspond with the codes on Barbee's records. For example, according to Barbee's records, on September 17 the winning number was 594 and "B1" collected $77.32 (after his commission). One of the handwritten slips in Walker's home contained the numbers "594" and "77.32." The other handwritten slip in Walker's apartment contained numbers which correspond with Barbee's record of how much "B1" collected and how much he paid out to winners on the eighteenth. The three by five card also contained the notation "Simp," with a telephone number beside it. The phone number belonged to Carl Simpson who, according to testimony before the Tax Court, was known to be involved in numbers.

15. The Commissioner computed Walker's unreported income by figuring from Barbee's calendar the "net take" for each day (total amount collected less twenty-five percent commission) and subtracting (1) each day's pay-outs to winning bettors and (2) another 5% of gross receipts for miscellaneous business expenses.

16. The Tax Court found that Walker's self-serving statements that he had never participated in a numbers operation other than as a player were not worthy of belief. Such a finding was not clearly erroneous. *United States v. Gerardo,* 552 F.2d at 553. Under *Gerardo,* however, the mere fact that Walker gave self-serving testimony does not suffice to meet the Commissioner's burden to provide a minimal foundation to connect the taxpayer with the gambling operation during the period in issue, *i.e.,* April 4 to August 5, 1966 in *Gerardo* and before September 17, 1974 in this case.

17. Unlike Gerardo, Walker was never convicted for his role in the gambling enterprise. Like *Gerardo,* this case involves an assessment where the Commissioner had minimal evidence linking the taxpayer to illegal gambling activities for just a portion of a tax year.

unreported income from April 4, 1966, four months before the commencement of the investigation, through February 3, 1967. There was only one reference in the Tax Court record to support the assessment from April 4 to August 5. On April 4, 1966 New Jersey prosecutors raided a residence in the Newark area and a large volume of betting slips were seized. Most of the codes on the slips taken in the April 4 raid matched those taken in the raids in February, 1967. In addition, several individuals arrested as a result of the April 4 search were observed to be part of the IRS investigation which resulted in Gerardo's conviction. The Court held that, although the August 5, 1966 to February 3, 1967 assessment was supported by sufficient evidence, the Commissioner had failed to produce the minimal predicate evidence necessary to raise the presumption of correctness as to the assessment before August 5, 1966. The Court determined that the identity of codes on the two sets of gambling records was insufficient evidence to link Gerardo to an illegal gambling enterprise before August 5, 1966:

> The raid conducted by the prosecutor's office of Essex County on April 4, 1966 disclosed no link to Gerardo nor did it reveal his participation in that lottery. Gerardo was not observed at that time, and no other investigation which implicated Gerardo took place between April 4 and August 5. *The codes on the April 4 betting slips, even though identical to those on the February 3 betting slips, do not, without more, identify Gerardo's involvement....* Even if we were to accept the Commissioner's assertion that the lottery observed by the IRS in August, 1966 was the same lottery as that being conducted in April, 1966, the evidence in the Tax Court of Gerardo's gambling activity, as distinct from unidentified gambling operations, was limited to the period from August 5, 1966 through February 3, 1967. We are obliged to conclude therefore that, absent proof in the record that Gerardo was involved in gambling activities from April 4, 1966 through August 5, 1966, no

court could properly draw an inference of such involvement.

*United States v. Gerardo*, 552 F.2d at 554. (Emphasis added).

In *DeCavalcante*, the taxpayer pled guilty to conspiracy to operate an illegal gambling enterprise between January 1, 1965 and December 15, 1969. The Commissioner assessed the taxpayer for unreported income from illegal gambling between 1965 and 1969. The Tax Court upheld the assessment for the second half of 1968 and 1969, but refused to find any deficiency between 1965 and the middle of 1968. Both sides appealed. This Court affirmed both aspects of the Tax Court's opinion. The investigation leading to DeCavalcante's conviction had taken place in 1968 and 1969. The Court refused to accept the Commissioner's argument that an inference should arise that the gambling enterprise must have begun before its detection and that this inference should provide the necessary predicate of minimal evidence for an assessment. The Court held:

> [I]n support of his pre-1968 assessment, the Commissioner argues that the gambling operation in which DeCavalcante was involved "manifestly did not arise overnight".... The Commissioner's argument misses the mark, however, by ignoring the fact that a similar inference could have been drawn in *Gerardo*. The essential point of *Gerardo* is that no inference is reasonable if it is wholly lacking of even a minimal factual basis.

*DeCavalcante v. Commissioner*, 620 F.2d at 28 (citations and footnotes omitted).

### III.

■ Under this Court's holdings in *Gerardo* and *DeCavalcante*, we must reverse the Tax Court's decision allowing the assessment from January 1, 1973 through September 16, 1974. *Gerardo* requires minimal predicate evidence linking the taxpayer's involvement in the illegal enterprise to the beginning of the assessment period. In the present case, Barbee's records make clear that the numbers operation was in existence in January, 1973.

The evidence of Walker's involvement in the operation for two days in September, 1974, however, does not give rise to an inference that he participated in the operation from its inception. Gerardo was, in fact, a stronger case for upholding the Commissioner's assessment than this one. Gerardo's position as third in command of the wagering operation from August, 1966 to February, 1967 did not justify an inference that he was involved in the game from April to August, 1966. The evidence in the present case indicates that Walker was involved not with the entire numbers business reflected in Barbee's records, but with just four of seventeen numbers runners.[18]

### IV.

The Tax Court also erred in its determination that the Commissioner was entitled to a presumption that all the proceeds of the lottery inured to Walker. The Tax Court relied on *Gerardo* for its conclusion. In that case, this Court stated:

> Gerardo's final contention that there was an insufficient factual basis upon which to attribute the entire proceeds of the lottery to him, is equally without merit. The record reveals sufficient evidence that, at least from August 5, 1966 through February 3, 1967, Gerardo held a controlling position in the lottery operation. That evidence suffices to give effect to the presumption of correctness of the Commissioner's determination. As the Commissioner points out, Gerardo's

argument that he should not be assessed with the entire tax as he was not the "boss" misses the mark.... It is not incumbent upon the Commissioner to show that no one except Gerardo received the lottery profits. Rather, it was Gerardo's burden to prove that others and not he alone shared the lottery proceeds. Gerardo, however, failed to sustain this burden.

*United States v. Gerardo*, 552 F.2d at 556.

The Tax Court's reliance on *Gerardo* is misplaced. *Gerardo* stands for the proposition that before the presumption of correctness can attach to the Commissioner's determination that a taxpayer should be charged with all the profits of an illegal business, the Commissioner must supply minimal predicate evidence to establish the proposition. Here the Commissioner has failed to make such a showing. Indeed, comparison of the betting slips seized at Walker's and Barbee's residences indicates that Walker was connected with only four of the enterprise's seventeen numbers runners. While Barbee's records reflect a net take of $2565.27 for September 17 and 18, 1974, Walker's records reveal a net take of only $556.54.[19] Not only has the Commissioner failed to come forward with any minimal predicate evidence, but the existing evidence shows that Walker did not have a controlling interest in the entire operation.

---

18. The Tax Court properly refused to afford any probative value to hearsay statements about Walker's role in the operation. It is unclear from its opinion whether the Tax Court gave any weight to the undercover investigator's observation of the telephone call placed by a numbers runner at the Blue Note Cafe on August 7, 1974. The telephone number the investigator saw the runner dial from a distance was two digits off from Mr. Walker's. This evidence does not supply the minimal predicate evidence necessary to link Mr. Walker to the gambling operation on August 7, 1974. The Tax Court stated that "although it may be reasonable" to assume that the investigator saw the numbers runner dial Walker's number, "this testimony is certainly not of a conclusive nature." *Walker v. Commissioner of Internal Revenue*, 46 T.C.M. (CCH) at 1270.

19. Walker's records show that four runners (coded "B–1," "16," "J" and "N") netted totals of $328.47 on September 17 and $333.07, less payoffs of $105, on September 18. Barbee's records show that these four runners and thirteen others netted totals of $1424.01, less payoffs of $15.00, on September 17 and $1360.26, less payoffs of $204, on September 18. The records reflect the same take (within a one dollar margin of error) for the four runners coded on both sets of records:

| CODE | 9/17/74 | 9/18/74 |
|------|---------|---------|
| B–1 | 77.32 | 114.22 |
| 16 | 107.72 | 98.87 |
| J | 111.18 | 74.01 |
| N | 32.25 | 45.97 |
| | 328.47 | 333.07 |

## V.

Having determined that no minimal evidentiary foundation supports the assessment for any period other than September 17 and 18, 1974, and that no minimal evidentiary foundation supports a finding that all of the profits of the operation inured to Walker, we reverse and remand for further proceedings consistent with this opinion.