# United States Tax Court

T.C. Memo. 2022-119

PALMARINI INC.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

BENITO PALMARINI AND BERNADETTE PALMARINI,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 1719-17, 1723-17.          Filed December 7, 2022.

————

In the years at issue, P Corp. was engaged in the business of online marketing and construction contracting. P–H, an individual, is the president of P Corp. Neither P Corp. nor P–H maintained books or records to determine their tax liabilities for 2013 and 2014, and the reporting of P Corp.'s income and expenses was split between P Corp.'s returns and P–H's Schedules C, "Profit or Loss From Business", attached to the returns he filed jointly with P–W.

R performed a bank deposits analysis of accounts owned by P Corp. and P–H and determined that P Corp. paid for certain personal expenses of P–H, including medical care, vacation, and maintenance of residential rental properties that he owned personally.

By a statutory notice of deficiency ("NOD") issued in November 2016, R determined that P Corp. underreported

[*2] its income and that certain deductions it claimed should be disallowed. R also determined that P–H received constructive dividends from P Corp. and that certain deductions he claimed should be disallowed. R further determined that P Corp. and P–H are liable for accuracy-related penalties for 2013 and 2014.

 *Held*: P–H's Schedules C are disregarded, all business income and expenses must be reported on P Corp.'s returns, and P Corp.'s payments of P–H's personal expenses were constructive dividends to P–H.

 *Held, further*, with few exceptions, Ps failed to substantiate deductions beyond amounts R concedes.

 *Held, further*, P Corp., P–H, and P–W are liable for accuracy-related penalties for 2013 and 2014.

———————

Benito Palmarini (an officer), for petitioner in Docket No. 1719-17.

Benito Palmarini and Bernadette Palmarini, for themselves in Docket No. 1723-17.

*Kristina L. Rico*, for respondent.

TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 4

FINDINGS OF FACT ................................................................. 5

 Palmarini Inc. and its ownership................................................... 5
 Palmarini Inc.'s business activity ................................................. 5
 Palmarini Inc.'s place of business ................................................ 6
 Palmarini Inc.'s 2013 and 2014 returns ....................................... 6
 Examination of Palmarini Inc.'s returns ...................................... 14
 Benito and Bernadette Palmarini .................................................. 15
 Rental properties ........................................................................ 15
 The Palmarinis' 2013 and 2014 returns ........................................ 16
 Examination of the Palmarinis' returns ........................................ 18
 NODs to Palmarini Inc. and to the Palmarinis ............................. 19

**[\*3]** Petition to Tax Court ................................................................ 19
    Settled and conceded issues ....................................................... 20

OPINION ............................................................................................ 24

I.   Burden of proof ......................................................................... 24
II.  Palmarini Inc.'s corporate income tax returns ............................ 25

    A.   Status as a corporation ......................................................... 25
    B.   Business activity .................................................................. 25
    C.   Gross receipts ...................................................................... 27
    D.   Deductions ........................................................................... 28

        1.   Officer compensation, salaries, and wages ..................... 28
        2.   Repairs and maintenance ................................................ 30
        3.   Bad debt ......................................................................... 31
        4.   Rent ................................................................................ 33
        5.   Depreciation ................................................................... 33
        6.   Advertising ..................................................................... 34
        7.   Other deductions ........................................................... 35

    E.   Constructive dividends ........................................................ 36

        1.   Paid out of earnings and profits ..................................... 36
        2.   Two-part test .................................................................. 37
        3.   Analysis .......................................................................... 38

    F.   Section 6662 accuracy-related penalties .............................. 41

III. The Palmarinis' individual income tax returns ........................... 42

    A.   Income ................................................................................. 42

        1.   Wages, salaries, tips, etc. ............................................... 42
        2.   Constructive dividends from Palmarini Inc. ................... 42
        3.   Other income .................................................................. 43

    B.   Schedule A casualty loss deduction for 2014 ....................... 43
    C.   Schedule C .......................................................................... 44
    D.   Schedule E rental properties ................................................ 45
    E.   Section 6662 accuracy-related penalties .............................. 46

IV. Conclusion ................................................................................. 47

[*4]     MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, *Judge*:  Pursuant to section 6212,[1] the Internal Revenue Service ("IRS") issued statutory notices of deficiency ("NOD") to petitioners Palmarini Inc. and Benito and Bernadette Palmarini on November 14, 2016, determining the following deficiencies in federal income tax and accuracy-related penalties under section 6662(a) for the years 2013 and 2014:

| Petitioner | Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|---|
| Palmarini Inc. | 2013 | $219,364 | $43,873 |
| | 2014 | 175,221 | 35,044 |
| Benito and Bernadette Palmarini | 2013 | 118,955 | 23,791 |
| | 2014 | 106,550 | 21,310 |

Palmarini Inc. and the Palmarinis filed timely petitions under section 6213(a) for redetermination of the deficiencies and penalties. After the parties' concessions, there are eight remaining issues for decision in these consolidated cases.  As to the corporation: (1) the amount of Palmarini Inc.'s gross receipts in 2013 and 2014; (2) whether Palmarini Inc. is entitled to certain income tax  deductions claimed for 2013 and 2014; (3) whether Palmarini Inc. constructively issued dividends to Mr. Palmarini in 2013 and 2014; and (4) whether Palmarini Inc. is liable for the section 6662 accuracy-related penalties.  As to the Palmarinis as individuals: (5) the amount of the Palmarinis' income for 2013 and 2014; (6) the Palmarinis' entitlement to certain income tax deductions claimed for 2013 and 2014; (7) whether Mr. Palmarini may report his advertising business on Schedule C, "Profit or Loss From Business"; and (8) whether the Palmarinis are liable for the section 6662 accuracy-related penalties.  To the extent not conceded by the Commissioner, we will uphold the IRS's adjustments in large part, and

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code (Title 26 of the United States Code) as in effect at the relevant times; references to regulations are to Title 26 of the Code of Federal Regulations ("Treas. Reg.") as in effect at the relevant times; and references to Rules are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded.

**[\*5]** we will hold petitioners liable for the section 6662 accuracy-related penalties.

On the evidence before us, and using the burden-of-proof principles explained below, we find the following facts.

## FINDINGS OF FACT

Palmarini Inc. is a Pennsylvania corporation with its principal place of business in Pennsylvania, and Benito and Bernadette Palmarini resided in Pennsylvania,[2] when they filed their petitions in these consolidated cases. (Benito and other members of the Palmarini family are mentioned below with their first names, but references to "Mr. Palmarini" in this opinion are to petitioner Benito Palmarini.)

*Palmarini Inc. and its ownership*

Before the incorporation of Palmarini Inc., its cement business was a sole proprietorship operated by Francesco Palmarini (Benito's father). Palmarini Inc. was incorporated in 1983, and its original shareholders were Benito (49.75%), his brother Pacifico Palmarini (49.75%), and Don Hurley (0.5%). Shortly after its incorporation, Benito transferred approximately two-thirds of his ownership interest in Palmarini Inc. to his father Francesco and his brother Manuel, and the shareholders of Palmarini Inc. thus became Pacifico (49.75%), Benito (16.58%), Francesco (16.58%), Manuel (16.58%), and Don Hurley (0.5%). In 2007 Francesco Palmarini transferred his interest in Palmarini Inc. back to Benito. Thereafter, the three brothers' interests in the corporation were Pacifico's 49.75%, Benito's 33.16%, and Manuel's 16.58%.

Benito, Pacifico, and Manuel Palmarini each served as officers of Palmarini Inc.; however, Pacifico did not actively engage in the corporation's business operations. During 2013 and 2014, Benito was the president of Palmarini Inc. and managed its operations.

*Palmarini Inc.'s business activity*

After its incorporation in 1983, Palmarini Inc. was primarily operated as a cement construction business. However, in 2013 and 2014,

---

[2] Absent stipulation otherwise, venue for an appeal in these cases would lie in the U.S. Court of Appeals for the Third Circuit. *See* § 7482(b).

[*6] revenues from affiliated online marketing[3] activity undertaken by Benito and Manuel (and not Pacifico) were deposited into Palmarini Inc.'s corporate bank accounts, and associated advertising expenses were paid from its corporate bank accounts. Palmarini Inc. did not receive any revenues from cement construction work in 2013 or 2014, and Palmarini Inc. did not own any rental property as part of its business activity. On Schedule K, "Other Information", of its original and amended 2013 and 2014 Forms 1120, "U.S. Corporation Income Tax Return", Palmarini Inc.'s business activity is reported as "affiliate marketing", except that on its latest-filed amended return for 2014, it is reported as "affiliate marketing (mainly) & cement work".

We find that in 2013 and 2014 Palmarini Inc.'s cement construction business was virtually dormant because its only construction work in the years at issue was uncompensated work on one of Mr. Palmarini's personal rental properties, and we find that Mr. Palmarini conducted the marketing activity through Palmarini Inc. and not through his limited liability company ("LLC"). *See infra* p. 15 and Part II.B.

*Palmarini Inc.'s place of business*

Palmarini Inc. maintained its principal place of business at a garage on Halstead Street in Philadelphia.[4] Manuel Palmarini owned the Halstead Street property and received rental payments from Palmarini Inc. for its use of the Halstead Street garage until March 2014, after which it became property of Palmarini Inc. Palmarini Inc. continued improving the Halstead Street garage until it was placed into service as corporate property in August 2014.

*Palmarini Inc.'s 2013 and 2014 returns*

1. *Palmarini Inc.'s record keeping*

Palmarini Inc. did not maintain any books or records, a general ledger, or profit and loss statement, nor did it engage the services of an accountant or bookkeeper or use any accounting software in 2013 and 2014. Instead, Mr. Palmarini manually reviewed the corporation's bank

---

[3] Affiliated online marketing is a business activity in which an intermediary ("the affiliate") hosts a link for a third party on a website and receives a commission when the affiliate's link generates business for the third party.

[4] The Halstead Street property is a double lot: A residential home stands on one lot and a stand-alone garage on the other.

**[*7]** and credit card statements to identify and distinguish corporate business expenses from personal expenses, then aggregated totals for reporting on Palmarini Inc.'s returns.

> 2. *Preparation and filing of original and amended returns*

Palmarini Inc. did not hire a return preparer to complete its 2013 and 2014 returns. Mr. Palmarini prepared all original and amended returns for Palmarini Inc. for 2013 and 2014.

Palmarini Inc. timely filed its Form 1120 for 2013 on March 10, 2014. Palmarini Inc. timely filed its Form 1120 for 2014 on March 6, 2015.

Starting within six days after filing the original 2014 return and over the next three months, Palmarini Inc. filed a series of amended returns for both years, on one occasion signing two amended returns for the same year (2013) on the same day (May 1, 2015), and on several occasions filing amended returns (for 2013) only days apart. The signature dates of the original and amended returns were as follows:

| *2013* | *2014* |
|---|---|
| March 10, 2014 (original) | |
| | March 6, 2015 (original) |
| March 12, 2015 | |
| April 4, 2015 | |
| | April 7, 2015 |
| April 25, 2015 | |
| April 28, 2015 | |
| May 1, 2015 | |
| May 1, 2015 | |
| | May 5, 2015 |
| June 25, 2015 | |
| | June 27, 2015 |

[*8]  The IRS accepted and processed Palmarini Inc.'s amended return for 2013 dated June 25, 2015, but it did not process any of the amended returns for 2014.

### 3.  *Accounting method*

On line 1 of Schedule K of both its original 2013 return and its original 2014 return, Palmarini Inc. responded to the prompt "Check accounting method" by checking the box for the "Cash" method of accounting (not "Accrual").  Several of its amended returns (including the first 2013 amended return, filed after the original 2014 return) included a Schedule K, and on those schedules the "Accrual" box was checked; but petitioners made no showing that the reporting of income and expenses on the amended returns was actually revised from the "Cash" method originals to reflect accrual of income and expenses.

Petitioners did not offer into evidence the corporation's returns for any years before 2013, nor any company books reflecting an accrual method; and the only evidence that those earlier returns might have used an accrual method is the trial testimony of Mr. Palmarini, which we did not find credible on the point.  His description of his preparation of the returns (viewing bank and credit card statements and tallying expenses reported there, *see infra* p. 26) gave no indication of accruing expenses rather than deducting them when paid.  Petitioners made no contention as to, and offered no evidence showing, Palmarini Inc.'s requesting the IRS's consent to a change of accounting method, in compliance with section 446(e).  We find that in fact Palmarini Inc. used the cash method of accounting and did not request consent to a change to the accrual method.  *See infra* Part II.D.3.

### 4.  *Gross receipts*

Palmarini Inc.'s gross receipts in 2013 and 2014 were entirely from affiliated online marketing, and not from Palmarini Inc.'s former cement activity.  Consistent with the IRS's bank deposits analysis ("BDA") (described below at pages 14–15), we find that Palmarini Inc. received gross receipts of $959,248 in 2013 and $937,532 in 2014.

These were not amounts that Palmarini Inc. reported.  Rather, on its original return for 2013, Palmarini. Inc. reported gross receipts of $812,629; but on its amended return filed March 12, 2015 (and also on those filed April 4 and April 25, 2015), it reported $894,963.  On line 1 of Part I of its amended return filed April 28, 2015, it reported in column (b) a reduction of $27,927 and in column (c) a "Correct amount"

[*9] of $866,986 as its gross receipts. Column (b) requires "explain in Part II", but Part II gives no explanation for this reduction. Palmarini carried over this lower amount to its subsequent amended returns, and the IRS apparently used it as its starting point in the notice of deficiency for 2013, discussed below.

On its original return for 2014, which was the apparent starting point of the IRS's examination of Palmarini Inc.'s 2014 return, discussed below, Palmarini Inc. reported gross receipts of $659,799. However, the IRS apparently overlooked the fact that Palmarini Inc. admitted that this amount was an error. Palmarini Inc. reported $943,281 in Part I of its amended return filed April 7, 2015, and admitted in Part II a "miscalculation of total income". (It also reported the larger amount on its subsequent amended returns for 2014.)

Entities that paid Palmarini Inc. issued to it (and filed with the Government) Forms 1099–MISC, "Miscellaneous Income", showing payments that totaled $628,149 for 2013 and $672,362 for 2014. Palmarini Inc. agrees that it received gross receipts of those amounts; but the Commissioner contends (and we find, as stated above and explained in Part II.B below) that these amounts were not the sum total of its gross receipts.

### 5.    *Officer compensation and salaries and wages*

We find that Palmarini Inc. paid officer compensation of zero for 2013 and 2014, and salaries and wages of $58,100 in 2013 and $76,500 in 2014. *See infra* Part II.D.1. Benito and Manuel Palmarini were the only persons who performed work for Palmarini Inc. in 2013 and 2014, and they did so not only in their capacities as officers but also as laborers for their work on one of Mr. Palmarini's personal rental properties. On its 2013 return Palmarini Inc. claimed deductions of $92,400 on line 12 for "Compensation of officers" and $15,000 on line 13 for "Salaries and wages"; but on its 2014 return it did not claim any such deductions. During 2013 and 2014 Palmarini Inc. did not report to the IRS on a Form W-2 any wages paid to anyone, nor did it file any associated employment tax returns (Form 940, "Employer's Annual Federal Unemployment (FUTA) Tax Return", and Form 941, "Employer's Quarterly Federal Tax Return") or pay any employment taxes. After the IRS selected Palmarini Inc.'s 2013 and 2014 returns for examination, the corporation filed with the IRS two Forms 1099 reporting non-employee compensation to two officers, Benito and Manuel Palmarini, for 2014 (but not for 2013). In anticipation of trial in these cases, Benito

**[\*10]** Palmarini created invoices from himself to Palmarini Inc. to substantiate the Form 1099 issued to him by Palmarini Inc.

### 6. *Repairs and maintenance*

Palmarini Inc. incurred no expenses to repair or maintain its own property in 2013 and 2014, *see infra* Part II.D.2, but the corporation did expend money in 2013 and 2014 to repair and maintain residential properties owned personally by Mr. Palmarini. Palmarini Inc. claimed a $114,719 deduction for repairs and maintenance on its 2013 return and did not claim any deduction for repairs and maintenance on its 2014 return. This 2013 deduction is related to Palmarini Inc.'s use of Benito and Manuel Palmarini's personally owned residential properties for storage of its machinery and equipment used in its (inactive) construction business. Palmarini Inc. also stored its machinery and equipment at the Halstead Street garage (which also served as its principal place of business), the lower level of a building on Chandler Street, and at a building on Knorr Street. *See infra* pp. 15–16.

### 7. *Bad debt deductions*

On line 15 of its original return for 2013, filed in March 2014, Palmarini Inc. claimed a deduction for "Bad debts" of $80,541. On line 15 of its original return for 2014, filed in March 2015, Palmarini Inc. claimed a deduction for "Bad debts" of $81,900. Both those amounts were revised on amended returns:

Six days later, on March 12, 2015, Palmarini Inc. increased its 2013 bad debt deduction to $123,429. On April 7, 2015, it reduced the 2014 bad debt deduction from $81,900 to zero, explaining: "Line 15 error on original return. Miscalculation as bad debt was taken as a deduction on '2013' return." The later amended returns for 2014 likewise reported no bad debt deduction. But for 2013 the amendments continued:

On April 25, 2015, Palmarini increased the 2013 bad debt deduction from $123,429 to $204,056, explaining: "Total deductions increased by $80,630.06 due to underreporting bad debt loss". Three days later, on April 28, 2015, the bad debt deduction was increased again, this time by about $33,000 to $237,458. We find on that amended return no legible explanation for the increase.

These bad debt deductions are based on an alleged unpaid balance of approximately $240,000 owed to Palmarini Inc. by Epic Media Group for affiliated online advertising services in 2011. At trial

[*11] Mr. Palmarini alleged that in 2011 Epic Media Group had reported, on Form 1099, payments made to Palmarini Inc. of $205,000 and that he had reported that income on Palmarini Inc.'s 2011 return. (Neither that return nor a Form 1099 was offered in evidence.) The unpaid balance for advertising services was later (on an unspecified date) allegedly negotiated down to $83,000; however, Epic Media Group failed to pay even this discounted amount and instead paid only $5,000 to Palmarini Inc. Mr. Palmarini alleges that he determined the debt to be worthless in 2013. (Although the precise amounts are difficult to understand, it seems that he first claimed on the original 2013 return an amount ($80,630) that roughly corresponded to the negotiated (but unpaid) lower amount ($83,000), and that he eventually claimed on amended returns an amount ($237,458) that roughly corresponded to the gross debt ($240,000)). If this is true, it is impossible to explain the intermediate amounts reported on some of the amended returns. Petitioners presented no documentary evidence to substantiate the accrual of the receivable (and the reporting of the accrued income) in 2011 (or any other year) or the write-off of the unpaid debt in 2013.[5] We find that the receivable was neither accrued nor written off as alleged and that no bad debt deduction is allowable. *See infra* Part II.D.3.

8. *Rents*

We find that Palmarini Inc. made recurring payments to Manuel Palmarini totaling $12,187 in 2013 and $13,387 in 2014 as rent, for the corporation's use of the Halstead Street garage as its principal place of business. Palmarini Inc. claimed no rent deduction on its original 2013 return but claimed a rent deduction of $18,129 on its first amended 2013 return.[6] The corporation did not claim any deduction for rents for 2014 but proved at trial that rent payments were made until March 2014.

---

[5] The Court engaged in this colloquy with Mr. Palmarini:

THE COURT: . . . Did you make any entry on your books to write off that debt in 2013?

THE WITNESS: Yes.

THE COURT: Does—do you want to show me that?

THE WITNESS: It was on my income tax return. I put it down.

THE COURT: I'm talking about the company books.

THE WITNESS: No. I don't have the company books here.

[6] The explanation on the amended return states: "On previous return—$18,129 payable for rents on line 16 not included".

[*12] This expense consisted of regular payments made by Palmarini Inc. to Manuel Palmarini in his capacity as owner of the Halstead Street garage, for Palmarini Inc.'s use of the garage as its principal place of business and for storage of its machinery and equipment.

### 9. *Depreciation*

Palmarini Inc. claimed a $6,035 deduction for depreciation on its 2013 return and did not claim a deduction for depreciation for 2014. The 2013 depreciation was claimed for a 2013 Ford F-150 pickup truck that was used in Palmarini Inc.'s cement construction business but owned by Mr. Palmarini personally. Palmarini Inc. maintains its entitlement to depreciate the cost of the truck, but because there is no evidence from which we can determine any business use percentage of the truck, we find that its business ownership and use are not substantiated. *See infra* Part II.D.5. We further find that Palmarini Inc. is entitled to depreciate the cost of the Halstead Street garage after it became the corporation's property and was placed in service in August 2014, and the Commissioner has conceded a depreciation deduction of $1,671 for 2014.

### 10. *Advertising*

Palmarini Inc. reported deductions for advertising expenses of $345,433 for 2013 and $577,156 for 2014. We find, consistent with the Commissioner's contention, that Palmarini Inc. paid $386,628 for advertising in 2013 and $452,390 for advertising in 2014 as part of its affiliated online marketing business. The 2013 amount is larger than Palmarini Inc. reported, so it is undisputed. The amount we allow for 2014 is smaller because we find that two alleged expenditures are not substantiated. *See infra* Part II.D.6.

### 11. *Other deductions*

Palmarini Inc. reported no line 26 "Other deductions" on its original returns for 2013 and 2014; and although it now claims such deductions for each year, we find that it has substantiated none. *See infra* Part II.D.7. The evolution of its reporting of "Other deductions" was as follows.

**[*13]**       a.       *2013*

Palmarini Inc.'s original Form 1120 for 2013, and the first amended return filed March 12, 2015, claimed no "Other deductions" on line 26.  Rather, such deductions were claimed only on the amended returns and in amounts that changed substantially over three months:

The *second* amended return filed April 4, 2015, claimed $18,129 and explained in Part II, "Explanation of Changes to Items in Part I": "On previous return—$18,129 payable for rents on line 16 not included".

The *fourth* amended return filed April 28, 2015, claimed $16,511, (not zero or $18,129, as on previous returns).  A statement attached to the fourth amended return, entitled "2013 Other Deductions", presents almost illegible entries totaling that amount, apparently from various sources (including "Cardpayments", "Amex", "Visa card", and "Paid cash").

The *sixth* amended return, dated May 1, 2015, claimed a further reduced amount—$14,826—that was itemized in an attached statement entitled "1120 Line 26 Other Deduction 2013", which presents entries totaling that amount that are stated to be derived from, inter alia, "Amex card ending 51007", "BOA card ending 9744", "Visa card ending 2031", and "Cash to wife".

The *seventh* amended return for 2013, filed June 25, 2015, claimed a much larger amount—$38,290.  The explanation in Part II states: "More deductions found in Line 26—Form 1120."  An attached statement entitled "Form 1120—Line 26—Other Deductions" presents entries totaling $38,290 derived from, inter alia, "Amex card ending 51007", "Bank of America card ending 9141", "Credit card end 3031", "Card ending 7732", and "Card ending C68-640".

       b.       *2014*

Palmarini Inc.'s original Form 1120 for 2014, and the first and second amended returns filed for that year, claimed no "Other deductions" on line 26.  Rather such deductions were claimed only on the final amended return, filed June 27, 2015, which claimed $57,337.

[*14] The explanation states: "More deductions taken for Line 26 missed in earlier return."

*Examination of Palmarini Inc.'s returns*

Palmarini Inc.'s 2013 and 2014 returns were selected by the IRS for examination and assigned to Revenue Agent Christine Berntsen. The starting point for the IRS's examination was the last-filed amended return for 2013 (dated June 25, 2015) and the original return for 2014 (dated March 6, 2015).

During the examination Palmarini Inc. did not provide any books or records reflecting its calculations of its gross income for 2013 or 2014. Accordingly, Agent Berntsen performed a BDA, whereby the IRS issued summonses to all banks at which Palmarini Inc. held accounts and sent letters to third parties to verify the type of income reflected by the deposits into the corporate accounts. Agent Berntsen determined that Palmarini Inc. received gross receipts of $959,248 in 2013 and $937,532 in 2014 (amounts greater than those reported on its returns). Agent Berntsen's 2013 gross income amount was greater by about $65,000 than the largest amount that Palmarini Inc. had reported on a 2013 return (i.e., $894,963 on amended returns); but her 2014 amount was about $6,000 *less* than the amount Palmarini Inc. reported on its amended return filed April 7, 2015 (i.e., $943,281). As is stated above at page 9 and is explained below in Part II.B, we find Agent Berntsen's analysis reliable and convincing.

Agent Berntsen then performed a disbursement analysis using Palmarini Inc.'s bank and credit card statements. Those statements listed both business expenses of the corporation and personal expenses of Mr. Palmarini. To distinguish between business and personal expenses, Agent Berntsen surveyed each line item on Palmarini Inc.'s bank and credit card statements, as well as check stub descriptions when available, and allowed deductions for all expenses that she determined were reasonably related to Palmarini Inc.'s business activities, which (on the basis of the income and expenses reflected on the corporate bank statements) she determined to be affiliated online marketing. In her analysis she did not allow Palmarini Inc. deductions for either personal expenses or for those which had no ascertainable business purpose, and all personal expenses borne by Palmarini Inc. were recharacterized as a constructive dividend to Mr. Palmarini in his capacity as shareholder.

[*15] On the basis of her BDA of 2013 and 2014, Agent Berntsen determined to increase Palmarini Inc.'s income for underreported gross receipts and disallowed deductions. Agent Berntsen also determined a constructive dividend to Mr. Palmarini as president and shareholder, and she determined that Palmarini Inc. is liable for accuracy-related penalties under section 6662.

*Benito and Bernadette Palmarini*

During 2013 and 2014, petitioner Bernadette Palmarini worked as a procurement analyst for the U.S. Department of Defense. She received wages of $78,049 in 2013 and $81,333 in 2014. Mr. Palmarini has worked as a cement contractor for Palmarini Inc. (an activity virtually dormant in the years at issue) and was paid wages of $58,100 in 2013 and $76,500 in 2014 by Palmarini Inc. for his work building the Neshaminy Street garage. Mr. Palmarini also received constructive dividends from Palmarini Inc. of $116,741 in 2013 and $62,798 in 2014. *See infra* Part II.E. Mr. Palmarini is also the owner of Affiliated Marketing Online, LLC ("AMOLLC"), a single-member LLC engaged in the business of affiliated online marketing. However, Mr. Palmarini viewed all accounts of Palmarini Inc. and AMOLLC as his own and used them as needed for both business and personal purposes; and as is stated above, we find that Mr. Palmarini operated the affiliated online marketing business not through AMOLLC but through Palmarini Inc.

*Rental properties*

Mr. Palmarini owned the following residential properties. He hired professional real estate management companies to manage the renting of these properties to tenants, and some of them were used both for paying tenants and for storage of equipment for Palmarini Inc. Mr. Palmarini is responsible for paying the utility costs associated with Palmarini Inc.'s use of these properties for storage of its equipment. (The parties have come to agreement about the income and some of the expenses from these properties, but some expenses remain in dispute. *See infra* Part III.D.)

1.    *Chandler Street*

The Chandler Street property is a duplex: the upstairs unit is a residence rented to tenants, and the downstairs unit is used by Palmarini Inc. as a business office. Palmarini Inc. did not pay rent to Mr. Palmarini for its use of the Chandler Street property. In March 2014 Benito Palmarini conveyed the Chandler Street property plus

[*16] $30,000 (paid by Palmarini Inc.) to Manuel Palmarini in exchange for the Halstead Street property. After that transaction, Manuel Palmarini held title to the Chandler Street property.

2.  *Knorr Street*

The Knorr Street property is a double duplex: one common floor leads to two residential units on the right and two on the left (for a total of four residential units); and a separate, lower level was used by Palmarini Inc. for storage of its machinery and equipment. Palmarini Inc. did not pay rent to Mr. Palmarini for its use of the Knorr Street property.

3.  *Neshaminy Street*

The Neshaminy Street property is a single-family home. Mr. Palmarini purchased the Neshaminy Street property in 2007 with Michael Smyth (each owning a one-half undivided interest). In 2009 Mr. Palmarini acquired full ownership of the Neshaminy Street property from Michael Smyth. Thereafter, Mr. Palmarini began a series of extensive renovations continuing from 2009 until 2011. He eventually attempted to sell the property but was unsuccessful (in part) because the property did not have a garage. He decided to build a garage for the Neshaminy Street property using the construction assets of Palmarini Inc. During 2013 and 2014, Palmarini Inc. was building a garage for the Neshaminy Street property, and the labor was performed by Benito and Manuel Palmarini.

4.  *Gypsy Lane*

The Gypsy Lane property is a single-family home. The Palmarinis purchased the property on April 11, 2008, for $145,000 and sold it at a loss on April 12, 2013, for $105,000.

*The Palmarinis' 2013 and 2014 returns*

The Palmarinis filed their original return for 2013 on March 4, 2014. They then filed three amended returns for 2013, the first of which was filed April 1, 2015, and the last two of which were not accepted by the IRS.

The Palmarinis filed their original return for 2014 on February 24, 2015. They then filed two amended returns for 2014, the first of which was filed on April 8, 2015, and the second of which was not

[*17] accepted by the IRS.  The Palmarinis did not use a paid return preparer for their 2013 and 2014 federal income tax returns.  Mr. Palmarini prepared all their original and amended returns for 2013 and 2014.

1.  *Casualty loss deduction*

In July 2014 a series of severe storms caused trees at the Palmarinis' personal residence to fall on their fence, destroying approximately 20 feet of the fence (two sections with a post in the middle).  The Palmarinis reported the damage to their insurance company, which determined the value of the damage to be approximately $3,360 and issued to the Palmarinis a check for $860 (the remainder after their $2,500 deductible) in settlement of their claim.

The Palmarinis received an estimate of $16,950 to remove and replace the damaged portions of the fence.  However, the manufacturer of the original fence was no longer in business, and the replacement sections would not have matched the original fence.  Mr. Palmarini sought an estimate to replace the entire fence (22 sections) and was quoted $62,850.  The Palmarinis spent $1,000 on repairs and then claimed a $44,511[7] deduction for casualty loss on their 2014 return, on the basis that the fair market value of their home declined due to having a mismatched fence.  We find that the insurance company's valuation of the damage was reasonable, and that the proper amount of the casualty loss would be the $2,500 "deductible" not paid by the insurance company, subject to the limitation on itemized deductions discussed below in Part III.B.

2.  *Schedule C for Affiliated Marketing Online LLC*

Included with the Palmarinis' 2013 and 2014 returns were Schedules C for AMOLLC.  The Schedule C for each year reported only gross receipts and advertising expenses, and each one reflects a net loss. (Because the gross receipts, the expenses, and the business activity itself are properly allocated to Palmarini Inc., as we found above at page 6,

---

[7] The amount of the casualty loss the Palmarinis reported on Form 4684, "Casualties and Thefts", is $54,400, and the amount of the deduction claimed (as limited by section 165(h)(1) and (2)) is $44,511.

[*18] we find that AMOLLC has no gross receipts, no deductions, and no losses for 2013 and 2014.)

### 3. *Schedule E rental properties*

The Palmarinis did not include with their 2013 return a Schedule E, "Supplemental Income and Loss", reporting their income and expenses from their rental properties, but they did include a Schedule E with their 2014 return reporting a net loss for the year and a corresponding $25,000 deduction pursuant to section 469(i).

*Examination of the Palmarinis' returns*

The IRS selected the Palmarinis' 2013 and 2014 returns for examination and assigned them to Agent Berntsen. The starting point for the examination of the Palmarinis' 2013 return was their first amended return filed on April 1, 2015; and the starting point for the examination of their 2014 return was their first amended return filed on April 8, 2015.

During the examination the Palmarinis did not provide any original books or records showing how they calculated gross receipts for AMOLLC in 2013 and 2014. Accordingly, Agent Berntsen performed a BDA for AMOLLC and the Palmarinis individually. Agent Berntsen determined to reduce the Palmarinis' "other" income to an amount less than they reported on their 2013 and 2014 returns and to increase their qualified dividend income because of her determination that Mr. Palmarini received constructive dividends from Palmarini Inc. for 2013 and 2014.

Agent Berntsen further determined to disallow all deductions claimed on Schedules A, "Itemized Deductions", for lack of substantiation. (Before trial the parties agreed on the itemized deductions except for the casualty loss.)

As to the Schedules C for AMOLLC, the agent determined to reduce gross receipts for 2013, to increase gross receipts for 2014, and to disallow all deductions for advertising for both years because the expenses were paid from Palmarini Inc.'s (rather than AMOLLC's) bank accounts. (The IRS later disallowed the Schedule C deductions in their entirety for both years, moving all income to elsewhere on the Palmarinis' returns or attributing it to Palmarini Inc.'s Forms 1120.)

**[\*19]** Agent Berntsen also determined to include Schedules D, "Capital Gains and Losses", to report the gain and loss from sales of stock and the sale of the Gypsy Street property. (The parties agreed before trial that the Palmarinis were entitled to a $3,000 loss deduction for each year.)

And as to the Schedule E rental properties, Agent Berntsen determined to increase rents received, to disallow all deductions claimed for 2013 and 2014,[8] and to suspend the amount of the Palmarinis' passive loss in excess of their passive income. (The parties later agreed as to the amounts of rental income the Palmarinis received in 2013 and 2014 as well as the amounts of substantiated Schedule E deductions, but the Palmarinis maintain their entitlement to additional amounts of certain Schedule E deductions as specified below.)

*NODs to Palmarini Inc. and to the Palmarinis*

The IRS issued to Palmarini Inc. and to the Palmarinis concurrent NODs for 2013 and 2014 on November 14, 2016, determining deficiencies in federal income tax and accuracy-related penalties under section 6662 for both years. Attached to each NOD were Letters 950, which proposed penalties and informed the Palmarinis of their appeal rights. The Letters 950 were signed by Mary Unger (Group Manager), Agent Berntsen's immediate supervisor during the examination of Palmarini Inc.'s and the Palmarinis' 2013 and 2014 returns.

*Petition to Tax Court*

Palmarini Inc. timely filed its petition in the Tax Court on January 23, 2017. The Palmarinis timely filed their petition in the Tax Court on January 23, 2017. These cases were consolidated for trial and were tried in Philadelphia, Pennsylvania.

---

[8] As we noted, the Palmarinis did not attach a Schedule E reporting income and expenses from their rental properties to their original 2013 return, but they did attach a Schedule E to their amended 2013 return filed April 23, 2015. Agent Berntsen treated the Palmarinis as having claimed for 2013 the amounts reported on the Schedule E attached to their amended return.

**[\*20]** *Settled and conceded issues*

During the pendency of these cases, the Palmarinis provided documentation supporting some of their reported expenses. Agent Berntsen reviewed the documents and issued a revised examination report for both Palmarini Inc. and the Palmarinis, which the Commissioner adopts as his position in these cases. The revised report for Palmarini Inc. made the following changes: (1) advertising expense deductions previously disallowed on Schedule C were allowed to Palmarini Inc. because the corporation paid AMOLLC's credit card bill; (2) Palmarini Inc. was allowed deductions for rent of the Halstead property while it was owned by Manuel Palmarini; (3) Palmarini Inc. was allowed a deduction for 2014 for depreciation of improvements to the Halstead property after Palmarini Inc. placed it in service as corporate property in August 2014.

The revised report for the Palmarinis made the following changes: (1) the Schedule C deductions were disallowed entirely, the advertising items were moved to Palmarini Inc.'s corporate returns, and the remaining items of income were moved to "other" income on the Palmarinis' returns; (2) the Palmarinis were allowed deductions on Schedule A for substantiated expenses; (3) the Palmarinis were allowed deductions for their Schedule E rental properties; and (4) the constructive dividend determination was reduced by excluding expenses to be reported by Palmarini Inc. We will order the parties to recompute petitioners' liabilities pursuant to Rule 155; and when they do so, they will take into account both the foregoing agreed items and our resolutions of the following disputed items.

The items listed below remain in dispute for Palmarini Inc., and we find for the reasons stated above and explained below that the amounts in the right-hand column were income actually received and expenses actually paid for deductible business purposes:

**[*21]**

*2013*

| Item | Return | NOD | Revised report | Amount in dispute | Amount allowed |
|---|---|---|---|---|---|
| Gross receipts | $866,986 | $959,248 | $963,248 | $335,099[9] | $959,248 |
| Advertising | (345,433) | (314,190) | (386,628) | -0- | (386,628) |
| Bad debt | (237,458) | -0- | -0- | (237,458) | -0- |
| Officer compensation | (92,400) | -0- | -0- | (92,400) | -0- |
| Salaries and wages | (15,000) | -0- | -0- | (15,000) | (58,100) |
| Repairs and maintenance | (114,719) | -0- | -0- | (114,719) | -0- |
| Rent expense | (18,229) | -0- | (12,187) | -0-[10] | (12,187) |
| Depreciation | (6,035) | -0- | -0- | (6,035) | -0- |
| Other deductions | (38,290) | -0- | -0- | (38,290) | -0- |

*2014*

| Item | Return | NOD | Revised report | Amount in dispute | Amount allowed |
|---|---|---|---|---|---|
| Gross receipts | $659,799 | $937,532 | $937,532 | $265,170[9] | $937,532 |
| Advertising | (577,157) | (421,901) | (452,390) | (87,146)[11] | (452,390) |
| Bad debt | (81,900) | -0- | -0- | (81,900) | -0- |
| Salaries and wages | | | | | (76,500) |
| Rent expense | -0- | -0- | (13,387) | (5,191)[10] | (13,387) |
| Depreciation | -0- | -0- | (1,671) | -0- | (1,671) |
| Other deductions | | -0- | -0- | | -0- |

---

[9] Palmarini Inc. admits that it received gross receipts of $628,149 in 2013 and $672,362 in 2014 (the total amounts on Forms 1099 issued to it for each year).

[10] Palmarini Inc. agrees to accept the Commissioner's revised determination of rents paid in 2013 but alleges it is entitled to an $18,578 deduction for rents paid in 2014.

[*22] The items listed below remain in dispute for Mr. and Mrs. Palmarini, and we find for the reasons stated above and explained below that the amounts in the right-hand column were income actually received and expenses actually paid for deductible purposes:

*2013*

| Item | Return | NOD | Revised report | Amount in dispute | Amount allowed |
|---|---|---|---|---|---|
| Wages, salaries, tips, etc. | $78,048 | n/a | n/a | n/a | $136,148 |
| Other income | 129,400 | $60,000 | $13,750 | -0- | 13,750 |
| Qualified dividends | -0- | 328,931 | 261,716 | $261,716 | 116,741 |
| Sch. C– | | | | | |
|   Gross receipts | 135,037 | 13,750 | -0- | 135,037 | -0- |
|   Advertising | (194,090) | -0- | -0- | (194,090) | -0- |
|   Business use of home | (61,660) | -0- | -0- | (61,660) | -0- |
| Sch. E– | | | | | |
|   Chandler St. repairs | (18,845) | -0- | -0- | (18,845) | -0- |
|   Chandler St. insurance | (985) | -0- | 90[12] | 1075 | 90 |
|   Chandler St. depreciation | 0 | n/a | n/a | n/a | 376 |
|   Knorr St. other | (29,450) | -0- | -0- | (29,450) | -0- |
|   Gypsy Ln. utilities | (404) | -0- | -0- | (404) | -0- |
|   Gypsy Ln. repairs | (3,810) | -0- | -0- | (3,810) | -0- |
|   Gypsy Ln. insurance | (330) | -0- | -0- | (330) | -0- |

---

[11] Palmarini Inc. alleges it is entitled to a $539,536 deduction for advertising expenses in 2014.

[12] The Commissioner's revised determination, based on documents provided by the Palmarinis, asserts that in 2013 the Palmarinis received insurance proceeds, $922, in excess of their insurance expense, $832, for Chandler St. in 2013 and that the net proceeds of $90 be included in their income. This determination is sustained for the reasons explained below in Part III.D.

**[*23]**

*2014*

| Item | Return | NOD | Revised report | Amount in dispute | Amount allowed |
|---|---|---|---|---|---|
| Wages, salaries, tips, etc. | $81,333 | n/a | n/a | n/a | $157,833 |
| Other income | 71,200 | $1,200 | $9,108 | -0- | 9,108 |
| Qualified dividends | -0- | 386,054 | 226,794 | $226,794 | 62,798 |
| Sch. A– Casualty loss | (54,400) | -0- | -0- | (54,400) | (2,500) |
| Sch. C– | | | | | |
| Gross receipts | (2,200) | (9,108) | -0- | (2,200) | -0- |
| Advertising | (30,238) | -0- | -0- | (30,238) | -0- |
| Other | (3,657) | -0- | -0- | (3,657) | -0- |
| Sch. E– | | | | | |
| Knorr St. other | (740) | -0- | -0- | (740) | -0- |
| Knorr St. utilities | (6,706) | -0- | (4,729) | (1,977) | (4,729) |
| Knorr St. depreciation | (9,820) | -0- | (732) | (9,188) | (732) |
| Halstead St. taxes | (2,783) | -0- | -0- | (2,783) | -0- |
| Halstead St. depreciation | (8,288) | -0- | -0- | (8,288) | -0- |
| Halstead St. cleaning and maintenance | (1,134) | -0- | -0- | (1,134) | -0- |
| Halstead St. insurance | (2,570) | -0- | -0- | (2,570) | -0- |
| Neshaminy St. depreciation | (14,182) | -0- | -0- | (14,182) | -0- |
| Neshaminy St. cleaning and maintenance | (2,800) | -0- | (1,220) | (1,580) | (1,220) |

**[\*24]**                                       OPINION

I.       *Burden of proof*

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer has the burden of proving it wrong. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *see also* Rule 142(a)(1). However, where the Commissioner alleges that a taxpayer underreported income, he must "provide some predicate evidence connecting the taxpayer to the charged activity" before the presumption of correctness attaches to his determination. *Gerardo v. Commissioner*, 552 F.2d 549, 554 (3d Cir. 1977), *aff'g in part, rev'g in part* T.C. Memo. 1975-341. Determinations of constructive dividends (as in these cases) are determinations of underreported income. And to support such determinations, the Commissioner must establish a sufficient connection between the income and the taxpayer before the presumption of correctness attaches to his determination of a constructive dividend. *See, e.g.*, *Austin Otology Assocs. v. Commissioner*, T.C. Memo. 2013-293, at \*23; *D'Errico v. Commissioner*, T.C. Memo. 2012-149, 103 T.C.M. (CCH) 1802, 1809. Once the Commissioner connects the taxpayer with the unreported income, the taxpayer then bears the burden of proving that he did not receive the income and that the Commissioner's determination of a deficiency is incorrect. *See Walker v. Commissioner*, 757 F.2d 36, 38 (3d Cir. 1985), *rev'g and remanding* T.C. Memo. 1983-538; *see also* Rule 142(a).

Important for such proof are the taxpayer's records. The taxpayer's record-keeping requirements for the income tax are set forth in section 6001, which requires that—

> *Every person liable for any tax* imposed by this title, or for the collection thereof, *shall keep such records*, render such statements, make such returns, and comply with such rules and regulations *as the Secretary may from time to time prescribe*. [Emphasis added.]

Those rules and regulations that the Secretary has prescribed are found in Treasury Regulation section 1.6001-1; and as is relevant here, they require a taxpayer to "keep such permanent books of account or records . . . as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information", *id.* § 1.6001-1(a), and to retain such books or records "for inspection by authorized internal revenue officers

[*25] or employees . . . so long as the contents thereof may become material in the administration of any internal revenue law", *id.* § 1.6001-1(e).

II.     *Palmarini Inc.'s corporate income tax returns*

   A.     *Status as a corporation*

As a C corporation (as defined in sections 7701(a)(3) and 1361(a)(2)), Palmarini Inc. is a separate federal income tax-paying entity, distinct from its shareholders. As the Supreme Court explained in *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 438–39 (1943) (footnotes omitted):

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.

By choosing to incorporate, Palmarini Inc.'s shareholders assumed both the benefits and burdens of the corporate form, and they may not disregard its separate status if they find it is disadvantageous for tax purposes. *See Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) ("[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not." (citations omitted)). Accordingly, in these cases we must determine the proper tax consequences to Palmarini Inc. and to the Palmarinis of the income and expenses shared between them and allocated amongst their tax returns.

   B.     *Business activity*

A taxpayer's gross income includes "all income from whatever source derived". § 61(a). If a taxpayer fails to keep adequate records,

**[\*26]** the Commissioner may determine the existence and amount of the taxpayer's income by any method that clearly reflects income. § 446(b).

Because Palmarini Inc. did not maintain adequate records, the Commissioner used the bank deposits method of proof to reconstruct Palmarini Inc.'s taxable income for 2013 and 2014 according to the cash receipts and disbursements method of accounting.[13] *See* § 446(c)(1). Use of a BDA to determine unreported income is well-recognized, and it begins by assuming that all bank deposits are taxable income[14] unless the taxpayer can show otherwise. *Estate of Mason v. Commissioner*, 64 T.C. 651, 656–57 (1975), *aff'd*, 566 F.2d 2 (6th Cir. 1977). We see no flaw[15] in the Commissioner's BDA here, and we point out that Mr. Palmarini's method of using his bank and credit card statements to distinguish business and personal expenses, categorizing those expenses, and calculating the totals is substantially the same. Furthermore, there is no evidence from which to determine Palmarini Inc.'s taxable income in 2013 and 2014 other than its bank and credit card statements.

The Commissioner's BDA revealed that Palmarini Inc. received all its revenues in 2013 and 2014 from affiliated online marketing activities and incurred substantial advertising expenses. The Commissioner determined Palmarini Inc.'s primary business activity in 2013 and 2014 to be affiliated online marketing, and his determination is not inconsistent with Palmarini Inc.'s own reporting on its 2013 and 2014 returns. Palmarini Inc. reported its business activity to be affiliate marketing and reported significant gross receipts and expenses from

---

[13] Under the cash receipts and disbursements method, income is recorded in the year received and expenses are deducted in the year paid. Treas. Reg. § 1.461-1(a)(1); *see also* §§ 451(a), 461(a).

[14] However, the Commissioner must take into account any nontaxable items or deductions for which he has knowledge. *DiLeo v. Commissioner*, 96 T.C. 858, 868 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992).

[15] Palmarini Inc. contends that the Commissioner's BDA method does not clearly reflect its income for 2013 and 2014 because Palmarini Inc. may not receive income from its affiliated online marketing business until 90–180 days after earning its right to payment. However, the Commissioner's use of the cash receipts and disbursements method of accounting resolves this concern, since it measures actual receipt of the income. Furthermore, this Court has long held that "[w]hen a taxpayer keeps no books or records, has large bank deposits, and offers no plausible explanation of such deposits, the Commissioner is not arbitrary or capricious in resorting to the bank deposit method for computing income." *Estate of Mason*, 64 T.C. at 657; *see also Clayton v. Commissioner*, 102 T.C. 632, 645 (1994); *DiLeo*, 96 T.C. at 867.

[*27] affiliated online marketing. The bad debt deduction Palmarini Inc. claimed for 2013 and 2014 relates to unpaid advertising services. Furthermore, Mr. Palmarini acknowledges that Palmarini Inc. did not receive any revenues from cement construction in 2013 or 2014. The only income-generating activity Palmarini Inc. engaged in in 2013 and 2014 was affiliated online marketing, and advertising income was deposited into (and expenses for advertising were paid from) Palmarini Inc.'s bank accounts. Although in preparing the returns Mr. Palmarini ostensibly allocated income and expenses from the affiliate marketing activity between Palmarini Inc. and AMOLLC, he made no showing of any fact-based distinction between such activity conducted for or through Palmarini Inc. and other such activity conducted for or through AMOLLC. Rather, he allocated expenses to AMOLLC's return only to generate losses reportable on Schedule C on the Palmarinis' individual returns that would then offset Mrs. Palmarini's otherwise taxable income. For all these reasons, we agree with the Commissioner's revised determination that all advertising income and expenses are properly reportable on Palmarini Inc.'s returns for 2013 and 2014.

C.    *Gross receipts*

Palmarini Inc. failed to maintain books and records that would have facilitated the determination of its income, and it proposes instead that its income should be deemed to consist of only the amounts that third parties reported on Forms 1099 as having paid to it—i.e., less than $700,000 in each year—thereby excusing itself from liability for any income it received that the payor did not happen to report to the IRS. This approach would let Palmarini Inc. benefit from its own failure, which we will not do. Rather, we consider the positions it has taken on its returns and discover that it has in fact reported gross receipts in amounts greater than those for which it now contends: It reported gross receipts of $894,963 on one of its amended 2013 returns and gross receipts of $943,281 on its amended 2014 returns. It has never explained where those numbers came from nor why they are not correct, and we think it highly unlikely that Palmarini Inc. would have *reported* more gross receipts than it *received*. The Commissioner's BDA determined that Palmarini Inc. received gross receipts of $959,248 for 2013 and gross receipts of $937,532 for 2014, and the Commissioner has accordingly satisfied his burden to provide predicate evidence connecting Palmarini Inc. to its underreported gross receipts. Because Palmarini Inc. does not demonstrate any flaw in the Commissioner's

[*28] methodology or calculations,[16] the Commissioner's determinations of Palmarini Inc.'s gross receipts for 2013 and 2014 are sustained.

D.    *Deductions*

When deductions are in dispute, the taxpayer must satisfy the specific requirements for any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). A taxpayer must also maintain records adequate to substantiate his income and deductions. § 6001. Amounts reported on tax returns, even though signed under penalty of perjury, are insufficient to substantiate the deductions claimed thereon. *Wilkinson v. Commissioner*, 71 T.C. 633, 639 (1979) (first citing *Roberts v. Commissioner*, 62 T.C. 834, 837 (1974); and then citing *Halle v. Commissioner*, 7 T.C. 245 (1946), *aff'd*, 175 F.2d 500 (2d Cir. 1949)).

We must resolve Palmarini Inc.'s entitlement to the following deductions.

1.    *Officer compensation, salaries, and wages*

Under section 162(a)(1), a taxpayer may deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" as an ordinary and necessary business expense. The test for determining the deductibility of compensation payments is (1) whether they are reasonable in amount and (2) whether they are in fact payments purely for services. Treas. Reg. § 1.162-7(a). Furthermore, only payments intended as compensation are deductible, and compensatory intent is a question of fact. *Paula Constr. Co. v. Commissioner*, 58 T.C. 1055, 1058–59 (1972), *aff'd*, 474 F.2d 1345 (5th Cir. 1973). The taxpayer bears the burden of proving compensatory

---

[16] Palmarini Inc. argues that the amount of gross receipts determined by the IRS in excess of the aggregate amount reported on Forms 1099 issued to Palmarini Inc. in 2013 and 2014 should be considered gifts to Palmarini Inc. However, whether a transfer is a gift is a question of fact, *Commissioner v. Duberstein*, 363 U.S. 278, 288 (1960), and we reject this characterization (a) because Palmarini Inc. received these payments in the ordinary course of its business, *see* § 61(a)(2), and alternatively (b) because Palmarini Inc. has not carried its burden of proving any donor's intention to make a gift, *see Commissioner v. Duberstein*, 363 U.S. at 285; *see also Robertson v. United States*, 343 U.S. 711, 713 (1952) ("[P]ayment for services rendered . . . is in no sense a gift"). Similarly, all of Palmarini Inc.'s attempts to recharacterize as gifts its payments to others fail for lack of evidence of Palmarini Inc.'s intention to make gifts.

**[\*29]** intent. *King's Court Mobile Home Park, Inc. v. Commissioner*, 98 T.C. 511, 514 (1992).

### a. *Officer compensation*

Palmarini Inc. claimed a $92,400 deduction for officer compensation on its 2013 return, and no deduction for 2014. The Commissioner disallowed Palmarini Inc.'s deduction on the basis of lack of substantiation that the payments were made and that they were made purely for the services of the officers. The fact that Palmarini Inc. did not file any associated Forms W–2 or employment tax returns (Forms 940 and 941) nor pay any associated employment taxes, *see* §§ 3101, 3102, 3111, 3301, and the fact that Mr. Palmarini did not report any wage income from Palmarini Inc. on his 2013 individual income tax return, both weigh against its contention that such payments were made.

Palmarini Inc. responds that its Form 1125–E, "Compensation of Officers", attached to its 2013 return substantiates its deduction for officer compensation. However, this reporting form attached to the return does not prove that any amounts intended as compensation were in fact paid to officers, and Palmarini Inc.'s bank records do not show any payments that could be so interpreted. Palmarini Inc.'s deduction for officer compensation is disallowed for lack of substantiation.

### b. *Salaries and wages*

Palmarini Inc. also claimed a $15,000 deduction for salaries and wages on its 2013 return and no deduction for 2014. The Commissioner disallowed this deduction for lack of substantiation. We hold that Palmarini Inc. is entitled to deduct the payments made to Mr. Palmarini in return for his labor building the Neshaminy Street garage.

Mr. Palmarini testified at trial that he and Manuel Palmarini worked for Palmarini Inc. renovating the garage at Neshaminy Street. He produced invoices reflecting payments made to him for his labor which (although not contemporaneous) reference check numbers corresponding with disbursements that the Commissioner identified as "cash" and included in his proposed constructive dividend to Mr. Palmarini. These payments are recurring, and they corroborate Mr. Palmarini's testimony that they were payments for his labor on the Neshaminy Street garage. Palmarini Inc. is entitled to deduct $58,100

**[\*30]** for 2013 and \$76,500 for 2014 for wages paid to Mr. Palmarini for his labor.[17]

### 2. *Repairs and maintenance*

Section 263(a)(1) requires that the cost "for permanent improvements or betterments made to increase the value of any property" be capitalized, not immediately deducted. Only "[t]he cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense" in the current year. Treas. Reg. § 1.162-4 (2011);[18] *see also* Treas. Reg. § 1.263(a)-3(i)(1)(i). On the other hand, amounts paid for improvements, *see* Treas. Reg. § 1.263(a)-3(d), betterments, *see id.* para. -3(j), restorations, *see id.* para. -3(k), or adaptations, *see id.* para. -3(*l*), of real property are considered capital expenditures.

Palmarini Inc. claimed on its 2013 return a \$114,719 deduction for repairs and maintenance and no such deduction for 2014. Palmarini Inc. now argues that it should be allowed a \$97,990 deduction for repairs and maintenance for 2013 and a \$183,578 deduction for repairs and maintenance for 2014 for expenses on the following properties: (1) Halstead Street garage; (2) Halstead Street home; (3) Chandler Street ground floor; (4) Knorr Street ground floor; and (5) Neshaminy Street. The Commissioner disallowed Palmarini Inc.'s deduction for

---

[17] In an income tax deficiency case, we lack jurisdiction to determine any employment tax consequences in the absence of a notice of determination of worker classification issued to the petitioner. *See Charlotte's Office Boutique, Inc. v. Commissioner*, 121 T.C. 89, 103 (2003) ("It is the Commissioner's determination of worker classification that provides the predicate for our jurisdiction under section 7436(a) . . . ."), *supplemented by* T.C. Memo. 2004-43, *aff'd*, 425 F.3d 1203 (9th Cir. 2005); *see also Povolny Group, Inc. v. Commissioner*, T.C. Memo. 2018-37, at \*7–9 (determining employment tax deficiencies in an income tax deficiency case where the Commissioner also issued to the taxpayer a notice of determination of worker classification). However, because it appears no employment tax returns were filed with respect to amounts paid as wages to Mr. Palmarini, the statute of limitations for assessment of any associated employment taxes likely remains open under section 6501(a).

[18] Treasury Regulation section 1.162-4 (2011) (quoted above) was replaced by Temporary Treasury Regulation section 1.162-4T (2013), *see* T.D. 9564, 2012-14 I.R.B. 614, which became final as of January 1, 2014, *see* T.D. 9636, 2013-43 I.R.B. 331. Although this regulation was redrafted and given new organization, its underlying policy is identical. *See* Treas. Reg. § 1.162-4(a) (2014) ("A taxpayer may deduct amounts paid for repairs and maintenance to tangible property if the amounts paid are not otherwise required to be capitalized").

**[\*31]** repairs and maintenance in its entirety because the repairs were not made to property owned by Palmarini Inc.

We sustain the Commissioner's determination that Palmarini Inc.'s deductions for repairs and maintenance should be disallowed in full for lack of substantiation. To the extent that these deductions are substantiated and relate to Palmarini Inc.'s principal place of business at the Halstead Street garage, they will be allowed, *see infra* Part II.D.5, as depreciation after the garage became corporate property. The remainder of Palmarini Inc.'s deductions relate to properties owned individually by Mr. Palmarini. Palmarini Inc. cannot take a deduction for repairs and maintenance to property it neither owned nor leased, *see, e.g.*, *Arevalo v. Commissioner*, 124 T.C. 244, 251 (2005) ("[W]hen a taxpayer never actually owns the property in question, the taxpayer is not allowed to claim deductions for depreciation"), *aff'd*, 469 F.3d 436 (5th Cir. 2006), even if it paid the expense and used these properties for business purposes. Furthermore, to the extent that these alleged expenditures for "repairs and maintenance" of Mr. Palmarini's rental properties might be capital expenditures that could be deductible to Palmarini Inc. as depreciation of improvements to leased property, *see* Treas. Reg. §§ 1.162-11(b)(1), 1.263(a)-3(f), Palmarini Inc. did not offer sufficient evidence to enable us either to conclude that such a leasehold arrangement existed between Mr. Palmarini and Palmarini Inc. in 2013 and 2014 or to distinguish between repairs and maintenance done to areas used by Palmarini Inc. or areas occupied by residential tenants.

### 3.   *Bad debt*

Section 166(a) grants a taxpayer a deduction for any bona fide debt that becomes wholly or partially worthless within the taxable year. To prove entitlement to a bad debt deduction, the taxpayer must show (1) the existence of a bona fide debt, (2) incurred in connection with a trade or business, (3) that became worthless within the taxable year. *See* § 166. "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money", Treas. Reg. § 1.166-1(c), and whether a debtor-creditor relationship exists is a question of fact, *Fisher v. Commissioner*, 54 T.C. 905, 909 (1970). Factors indicating a bona fide debt include whether: (1) evidence of indebtedness exists; (2) any security is requested; (3) there has been a demand for repayment; (4) the parties' records reflect the transaction as a loan; (5) any payments have

[*32] been made; and (6) interest was charged. *See Sundby v. Commissioner*, T.C. Memo. 2003-204, 86 T.C.M. (CCH) 58, 61 (2003).

The Commissioner disallowed Palmarini Inc.'s bad debt deductions for 2013 and 2014 in full because they do not relate to a bona fide debt and they lack substantiation. We agree. There was no loan from Palmarini Inc. to Epic Media Group—rather, the relationship between them was business-consumer and not debtor-creditor. Palmarini Inc. is not permitted to take a bad debt deduction for 2013 and 2014 for an unpaid invoice from 2011. We agree with the Commissioner's determination that Palmarini Inc.'s bad debt deductions for 2013 and 2014 must be disallowed.

The circumstances in which a debt consisting of an unpaid receivable may support a loss deduction are not present here. The regulations provide that "[a] debt arising out of the receivables of an *accrual* method taxpayer is deemed to be an enforceable obligation . . . to the extent that the income such debt represents have been included in the return of income for the year for which the deduction as a bad debt is claimed or for a prior taxable year." Treas. Reg. § 1.166-1(c) (emphasis added). However, in 2013 and 2014 Palmarini Inc. was a cash basis taxpayer. *See supra* Part II.B. The corporation so stated on its original returns for the year and did not make any credible showing that it had ever filed returns on any other basis.

It is possible for a taxpayer to change methods of accounting, so one can posit an accrual-method taxpayer who accrued income in 2011 as the result of a receivable that later became worthless in 2013, after the taxpayer had become a cash-method taxpayer. However, section 446(e) provides: "[A] taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books *shall*, before computing his taxable income under the new method, secure the consent of the Secretary." (Emphasis added.) The provision is mandatory.

There is no evidence supporting the position that the unpaid balance from Epic Media Group was accrued as income in a prior year, nor that Palmarini Inc. requested the IRS's consent to change from its supposed 2011 accrual method to the cash basis method it reported on its original returns for the years at issue.

**[\*33]**  4. *Rent*

Section 162(a)(3) allows a deduction for rental expenses, provided that the payment is made as a condition to the continued use or possession (for the purposes of the trade or business) of property in which the taxpayer has no title and no equity.

Palmarini Inc. claimed a $18,229 deduction for rents paid on its 2013 return, and no deduction for 2014. In his revised report, the Commissioner allowed Palmarini Inc. a $12,187 deduction for 2013 and a $13,387 deduction for 2014 for rent of the Halstead Street garage while it was owned by Manuel Palmarini. Palmarini Inc. accepts the Commissioner's revised determination as to 2013 but argues that it should be allowed to deduct an additional $5,191 for rent for 2014 because $18,578 is the total amount of payments issued by Palmarini Inc. to Manuel Palmarini in 2014. However, Manuel Palmarini owned Halstead Street only until March 2014, after which it became property of Palmarini Inc. Palmarini Inc. cannot deduct rent payments for Halstead Street after the property became its own. *See* § 162(a)(3). We therefore sustain the Commissioner's revised determinations for rents paid in 2013 and 2014.

  5. *Depreciation*

Section 167(a) allows a deduction for depreciation of property "used in the trade or business" or "held for the production of income". To prove entitlement to a deduction for depreciation, a taxpayer must show (1) the existence of a trade or business; (2) that the property in question is used in the trade or business; and (3) a depreciable basis in the asset by showing the cost of the property, its useful life, as well as any previously allowable depreciation. *See, e.g.*, *Cluck v. Commissioner*, 105 T.C. 324, 337 (1995).

Palmarini Inc. claimed a $6,035 deduction for depreciation on its 2013 return, and no deduction for 2014. In his revised report the Commissioner disallowed Palmarini Inc.'s depreciation deduction for 2013 and allowed a $1,671 deduction for depreciation of the Halstead property after it was acquired by Palmarini Inc. and put into service in August 2014. Palmarini Inc. does not allege that it is entitled to an additional amount for depreciation for 2014, so that determination will be sustained.

Palmarini Inc. argues that, in addition, it is entitled to depreciate the cost of its pickup truck for 2013. The Commissioner disallowed this

**[\*34]** deduction because the truck was not property of Palmarini Inc. The bill of sale for the truck suggests that it is property of Mr. Palmarini and that it has mixed business and personal use; and a taxpayer claiming depreciation of a mixed-use asset must show the relevant proportions of business and personal use. *See* §§ 274(d), 280F(b), (d)(4); *see also Finney v. Commissioner*, T.C. Memo. 1980-23, 39 T.C.M. (CCH) 938, 950–51 (holding that the taxpayer has the burden to prove the percent of business use); Treas. Reg. §§ 1.167(a)-2, 1.280F-2T(i)(1). Because there are no adequate records to ascertain the business use percentage of the truck, we cannot determine the proper amount of any depreciation deduction, and the deduction must be disallowed for lack of substantiation and failure of proof. *See* Rule 142(a).

### 6. *Advertising*

"[A]dvertising and other selling expenses" that "pertain to the taxpayer's trade or business" are generally deductible under section 162 as an "ordinary and necessary" expense. *See* Treas. Reg. § 1.162-1(a)(1). Here, Palmarini Inc. claimed (and the IRS allowed) advertising expenses related to its affiliated online marketing business.[19]

#### a. *2013*

Palmarini Inc. deducted $345,433 for advertising expenses on its 2013 return, and the Commissioner determined that it paid $386,628 for advertising expenses in 2013. Because the Commissioner determined an amount greater than what Palmarini Inc. claimed on its 2013 return, and Palmarini Inc. does not allege it is entitled to a greater amount, there is no additional amount in dispute,[20] and the Commissioner's determination is sustained.

#### b. *2014*

Palmarini Inc. deducted $577,156 for advertising expenses on its 2014 return, and the Commissioner determined that it paid $452,390 for

---

[19] Given the nature of affiliated online marketing—incurring expense to place ads for customers—we think the technically correct character of this deduction for supposed advertising expenses might instead be cost of goods sold. However, Mr. Palmarini reported the expenses as advertising, and the IRS allowed them as such, and we will not disturb the parties' agreed-to characterization.

[20] The principal dispute regarding advertising expenses is whether Mr. Palmarini should be allowed to report them on his Schedule C for AMOLLC. *See infra* Part III.C.

[*35] advertising expenses in 2014. Palmarini Inc. alleges that it is entitled to deduct an additional $87,137 for advertising expenses for 2014, comprised of $52,252 paid to Media Traffic and $34,885 paid to an unspecified Bank of America account.

Regarding the $52,252 paid to Media Traffic, the report from Media Traffic on which Palmarini Inc. relies for substantiation is in the stipulation of facts that the Commissioner reviewed in making his revised determination, but it is unclear whether the Commissioner included this amount in his allowance for advertising expenses for 2014. We assume he did not (and we therefore consider whether this might be an additional deductible amount), but the report from Media Traffic is, by itself, insufficient to substantiate an additional deduction, because it neither specifies whether the amounts shown are revenues or expenses nor shows whether the expenses (if expenses) were in fact paid by Palmarini Inc. *See* § 461(a) (requiring deductions to be taken "under the method of accounting used"); Treas. Reg. § 1.461-1(a)(1) (requiring cash-method taxpayers to claim deductions "for the taxable year in which paid"). And regarding the $34,885 paid to the unspecified Bank of America account, we do not have any account statements from which to verify the specific amounts paid, to whom payments were made, and their business purpose. *See* § 162(a) (allowing deductions for expenses "paid . . . in carrying on any trade or business"); § 6001 (requiring the keeping of records). Accordingly, Palmarini Inc. has failed to carry its burden of proving that it is entitled to deduct additional amounts for advertising in excess of the Commissioner's revised determination, and the Commissioner's revised determination is sustained.

7. *Other deductions*

Palmarini Inc. deducted $38,290 for "other" expenses on its latest amended 2013 return and deducted $57,337 on its latest amended return for 2014 (filed June 27, 2015). Palmarini Inc. further alleges that it is entitled to an additional $165,122 deduction for "other" expenses for 2013 from a VIST bank account ending in -2508. And Palmarini Inc. now argues for an additional $128,550 deduction for "other" expenses for 2014 from the same bank account. The classification given to these expenses in Palmarini Inc.'s post-trial brief is mostly advertising expenses, expenses related to Mr. Palmarini's rental properties, or unspecified expenses. Mr. Palmarini also claimed at trial that he believes there is a third American Express card issued to him personally that the Commissioner did not consider when revising his determinations. Mr. Palmarini provided a year-end summary sheet

**[\*36]** from American Express to substantiate what he alleges are further business deductions to which he should be entitled, and he points to Palmarini Inc.'s bank statements showing that it paid $364,261 to American Express in 2013 and $467,369 in 2014.

However, we find his testimony not credible and his documentary evidence not convincing. Palmarini Inc.'s disorganized recordkeeping (if it can be called recordkeeping) does not enable one to verify the business purpose and specific amounts paid for "other" expenses. His documents show a tangle of business and personal, of capital and ordinary, and of mixed lines of potential business. His information was in such disarray that he himself, preparing returns in the months after the close of the years at issue, was unable to determine with reasonable certainty his own deductible expenses, so he filed a series of amended returns claiming deductions inexplicably "not included" in a return filed days before, or stating "[m]ore deductions found in Line 26."

He now insists that he had (and that he presented to the IRS statements from) "10 credit cards with huge charge expenses on them in 2013"; but he offers no explanation as to why he did not report the expenses from those cards on his sixth and seventh amended returns for 2013, on which he did report expenses attributed to "Amex card ending 5107", "BOA card ending 9744", "Visa card ending 2031", "Bank of America card ending 9141", "Credit card ending 7732", and "Card ending C68-640". The years that have passed since he prepared those amended returns in 2015 have not improved the situation, as papers scatter, memories fade, document retention periods expire. The best time to tally business expenses for 2013 and 2014 was when the returns were due, in 2014 and 2015; but Mr. Palmarini now unwittingly discredits his own contemporaneous reporting by years-late allegations of substantial additional expenses. To the extent that Palmarini Inc. argues for deductions greater than the Commissioner has elsewhere conceded, it has failed to carry its burden of proof, and the Commissioner's revised determination is sustained.

E. *Constructive dividends*

1. *Paid out of earnings and profits*

Section 301(c) controls the treatment of distributions of property from a corporation to its shareholders. § 301(a). Under section 301(c)(1), a shareholder must include in gross income any portion of the distribution which is a dividend (i.e., it is paid out of the corporation's

**[\*37]** earnings and profits, *see* § 316(a)).[21]   On the basis of Palmarini Inc.'s gross receipts less allowed deductions for 2013 and 2014, it did have sufficient earnings and profits to issue dividends to Mr. Palmarini. *See* § 316(a).

### 2.   *Two-part test*

Dividends may be formally declared or constructive.   A constructive dividend arises "[w]here a corporation confers an economic benefit on a shareholder without the expectation of repayment, . . . even though neither the corporation nor the shareholder intended a dividend." *Magnon v. Commissioner*, 73 T.C. 980, 993–94 (1980); *see also C.F. Mueller Co. v. Commissioner*, 479 F.2d 678, 683 (3d Cir. 1973) ("A taxpayer who is a shareholder has been held to have received a constructive dividend when he receives an economic benefit through a diversion of corporate earnings and profits"), *aff'g* 55 T.C. 275 (1970). "However, 'not every corporate expenditure which incidentally confers economic benefit on a shareholder is a constructive dividend.'   The crucial test of the existence of a constructive dividend is whether 'the distribution was *primarily* for the benefit of the shareholder.'" *Magnon*, 73 T.C. at 994 (emphasis added) (quoting *Loftin & Woodard, Inc. v. United States*, 577 F.2d 1206, 1214 (5th Cir. 1978)).   Thus, there is a two-part test to determine a constructive dividend: (1) the expense must be nondeductible to the corporation, and (2) it must represent some economic gain, benefit, or income to the shareholder. *See, e.g.*, *Dobbe v. Commissioner*, T.C. Memo. 2000-330, 80 T.C.M. (CCH) 577, 587, *aff'd*, 61 F. App'x 348 (9th Cir. 2003).   But it should be borne in mind that where the Commissioner has determined a constructive dividend as unreported income, he bears the burden of production to show a connection between that income and the taxpayer. *See, e.g.*, *Austin Otology Assocs.*, T.C. Memo. 2013-293, at \*23; *D'Errico*, 103 T.C.M. (CCH) at 1809.   Ordinarily, the Commissioner's showing that a corporate expenditure produced a benefit to the shareholder implicitly satisfies his burden of production to connect the shareholder-taxpayer with the underreported income; however, as we will show, the

---

[21] If the distribution exceeds the corporation's earnings and profits, the excess is first a return of capital to the extent of the shareholder's adjusted basis in the corporation's stock, *see* § 301(c)(2); and any further remainder is treated as a long-term capital gain, *see* § 301(c)(3).

**[*38]** Commissioner's method of determining constructive dividends is, in some instances in these cases, problematic.

The Commissioner's initial determination of constructive dividends to Mr. Palmarini ($328,931 in 2013 and $386,054 in 2014) reflected the difference between Palmarini Inc.'s total disbursements and its allowed deductible expenses for those years. That is, the Commissioner initially assumed that any expenditure by Palmarini Inc. that was not deductible was a dividend to Mr. Palmarini. The Commissioner's revised determination of constructive dividends ($261,716 in 2013 and $226,794 in 2014) acknowledged certain additional expenditures conceded to be deductible by Palmarini Inc., but his revised determination still calculates the constructive dividends to Mr. Palmarini to be total disbursements less allowable deductions. However, this shorthand method of calculating a constructive dividend does not satisfy the Commissioner's burden of production to connect unreported income with Mr. Palmarini. *See Ashby v. Commissioner*, 50 T.C. 409, 418 (1968) ("The fact that the full amounts have been disallowed as deductions to the corporation does not necessarily mean that the full amounts are to be treated as dividends to the individual"). For each expense included in the constructive dividends, the Commissioner must first establish a connection with Mr. Palmarini and then show that the payment was primarily for his benefit. *See Gerardo v. Commissioner*, 552 F.2d at 554; *Magnon*, 73 T.C. at 994.

3.    *Analysis*

a.    *Payments lacking description*

The Commissioner put into evidence lead sheets showing his revised determinations of constructive dividends to Mr. Palmarini in 2013 and 2014. The lead sheets show Palmarini Inc.'s gross receipts and allowed deductions, categorize Palmarini Inc.'s nondeductible expenses and give totals, and identify expenses that were removed from the constructive dividend to arrive at the revised amounts. For certain expenses the Commissioner included description lines specifying what the payments were for, while for others there were no such descriptions. The expenses lacking descriptions categorically fail to satisfy the Commissioner's burden to connect the payments to Mr. Palmarini, *see Gerardo v. Commissioner*, 552 F.2d at 554, and likewise fail to show that the payments were primarily for his benefit, *see Magnon*, 73 T.C. at 994. All categories of expenses without accompanying descriptions must accordingly be removed from the constructive dividend determination.

**[\*39]**                    b.      *Payments for the benefit of relatives*

Furthermore, not every expense for which the Commissioner did include a description shows a sufficient connection with Mr. Palmarini. For example, there are categories labeled "Manuel Palmarini",[22] "Dora Pasquali bill payment", and "Pacifico Palmarini bill payment". The Commissioner's descriptions identify Dora Pasquali as Mr. Palmarini's mother, and the evidence shows that Manuel and Pacifico are Benito's brothers—but these two brothers are also shareholders and officers of Palmarini Inc. for whose benefit the payments could well have been made. Manuel was active in the business; and Pacifico held a greater share of the company than Benito. Although it is not unreasonable to speculate that Benito could have authorized these payments by Palmarini Inc. in his capacity as an officer, such authorization does not necessarily connect these payments to Benito Palmarini as income, nor show that these payments were primarily for his benefit. In our view, the most reasonable supposition is that the payments to Manuel and Pacifico are primarily for their own benefit. The payments to their mother are primarily for her benefit; and if we postulate that a payment to her gives rise to an indirect benefit to her son, then that indirect benefit flows to each son equally. The categories labeled "Manuel Palmarini", "Dora Pasquali bill payment", and "Pacifico Palmarini bill payment" must therefore be removed from the constructive dividends. The cash category represents payments made to Mr. Palmarini for his labor (deductible to Palmarini Inc. as wages, *see supra* Part II.D.1.b, and included in Mr. Palmarini's income as such, *see infra* Part III.A.1), and those payments must also be removed from the constructive dividends.

                         c.      *"No statements provided"*

The Commissioner also included the $34,885 paid to an unspecified Bank of America account, *see supra* Part II.D.6.b, in his determination of a constructive dividend for 2014, and he gives the description "no statements provided". This contention seems to attempt to bypass the Commissioner's burden of production—i.e., to show benefit to Mr. Palmarini by showing that he failed to offer evidence disproving a benefit. But a payment to an unspecified bank account, without more information, proves neither a benefit to Mr. Palmarini nor income to

---

[22] This $10,000 expense is a distinct category from the $12,187 expense labeled "Manuel Palmarini bill payment" that the Commissioner removed from the constructive dividend and allowed as rent payment for Palmarini Inc.'s use of the Halstead Street garage.

[*40] him.  Just as this expense lacks substantiation to be a deduction to Palmarini Inc., it lacks substantiation to be deemed income to Mr. Palmarini, and therefore should not be characterized as a constructive dividend.

d.    *Personal and rental expenses*

The Commissioner explicitly identified the following categories of Palmarini Inc.'s expenditures as being for the benefit of Mr. Palmarini personally: (1) maintenance and upkeep of his Schedule E rental properties; (2) medical bills for himself and his family; (3) a family trip to Italy; and (4) a personal vehicle.  Checks written from Palmarini Inc.'s account (authorized by Mr. Palmarini) do indeed bear descriptions relating to his personal rental properties, healthcare for himself and his family, personal travel, and his personal vehicle, and they clearly establish a connection with him and demonstrate that the expenses were primarily for his benefit.  Furthermore, there is an expense category labeled simply "Ben Palmarini"; it has no further description, but it establishes a sufficient connection with Mr. Palmarini.  Given the Commissioner's showing, the burden to prove that these expenses should not be treated as constructive dividends therefore shifted to Palmarini Inc. and to Mr. Palmarini.  *See* Rule 142(a); *Walker v. Commissioner*, 757 F.2d at 38.  Petitioners do not meet that burden.

Mr. Palmarini argues that Palmarini Inc. uses his personal rental properties for the business purpose of storing its equipment, and that therefore its payments related to these properties are deductible business expenses of Palmarini Inc. in the nature of rent, rather than a constructive dividend to him.  Although we accept that Palmarini Inc. may have made some use of these properties for business purposes, there is no documented rental agreement between Palmarini Inc. and Mr. Palmarini for the corporation's use of the properties, nor are there any recurring payments from which to infer that anything like a rental arrangement existed.  Furthermore, these payments by Palmarini Inc. are to third parties, rather than to Mr. Palmarini, and the description lines simply state the address of the property and specify neither the work done nor its business purpose.  Palmarini Inc.'s expenses for maintenance and improvements to Mr. Palmarini's personal rental properties represent a constructive dividend to him, *see, e.g.*, *Magnon*, 73 T.C. at 994; and, to the extent set out in the Commissioner's revised examination report and the parties' stipulation of settled issues, Mr. Palmarini may deduct the third parties' expenditures as rental expenses on Schedule E.

**[\*41]** Mr. Palmarini further asserts that Palmarini Inc.'s corporate bylaws provide for paying the cost of medical care and of a vacation for officers and their families. No copy of Palmarini Inc.'s corporate bylaws was produced in these cases; but even if we assume their existence, a corporation's bylaws do not overrule the federal income tax consequences of a corporation's distributions to its shareholders. Financial benefits to be paid to officers have their federal tax consequences even if bylaws authorize those benefits to be paid. Palmarini Inc.'s payment of personal expenses for Mr. Palmarini and his family must be included in his income as a constructive dividend. *See, e.g., Dobbe*, 80 T.C.M. (CCH) at 587–88.

On the basis of these burden-of-proof principles, we hold that Mr. Palmarini received constructive dividends from Palmarini Inc. of $116,741 for 2013 and $62,798 for 2014. An itemization of the constructive dividends for 2013 and 2014 is included in the Appendix.

F.     *Section 6662 accuracy-related penalties*

Section 6662(a) imposes an "accuracy-related penalty" equal to 20% of the portion of an underpayment of tax that is attributable to the taxpayer's negligence or disregard of rules or regulations, *see* § 6662(b)(1), or that is attributable to any substantial understatement of income tax, *see* § 6662(b)(2). Section 6662(c) defines negligence to be "any failure to make a reasonable attempt to comply with the provisions of this title [i.e., title 26 U.S.C., the Internal Revenue Code]"; and negligence also includes "any failure by the taxpayer to keep adequate books and records or to substantiate items properly". Treas. Reg. § 1.6662-3(b)(1). Section 6662(d)(1)(B) provides that, for corporations, an understatement of income tax is "substantial" if it exceeds the lesser of either 10% of the tax that should have been reported on the return (or, if greater, $10,000) or $10 million.

Because Palmarini Inc. is not an "individual" within the meaning of section 7491(c), that section's burden-shifting provisions in the case of "any individual" do not apply, and the burden remains on Palmarini Inc. to prove it should not be held liable for the section 6662(a) accuracy-related penalties. Palmarini Inc. argues that it should not be held liable for the accuracy-related penalties because the IRS examination process lasted too long, and it cites Internal Revenue Manual 4.10.2.2.2 (Feb. 11, 2016) (establishing the agency's goal of completing examinations of business income tax returns within 27 months after the date the return is filed). It would be ironic if a taxpayer who had chaotic and incomplete

**[\*42]** records could escape penalty because it took the IRS a long time to puzzle out its income and deductions—but that is not the case. "It is a well-settled principle that the Internal Revenue Manual does not have the force of law, is not binding on the IRS, and confers no rights on taxpayers." *McGaughy v. Commissioner*, T.C. Memo. 2010-183, 100 T.C.M. (CCH) 144, 148. The only deadline that the IRS was required to meet in order to assess a deficiency in federal income tax was the 3-year period of limitations established by section 6501(a). Here, the 3-year period for assessment would have expired on April 15, 2017, for the year 2013, and on April 15, 2018, for the year 2014; and the NOD was timely issued to Palmarini Inc. on November 14, 2016, before either period expired. Section 6503(a)(1) provides that, upon the taxpayer's filing of a petition in the Tax Court, the period of limitations for assessment shall be suspended "until the decision of the Tax Court becomes final[], and for 60 days thereafter." The periods for assessment of the deficiencies in federal income tax against Palmarini Inc. for 2013 and 2014 therefore remain open during the pendency of these cases.

We are satisfied that Palmarini Inc. is liable for section 6662 accuracy-related penalties for 2013 and 2014 under either a negligence theory based on its failure to maintain adequate records or on a substantial understatement theory based on the extent of its underreported income and overstated deductions.

III.   *The Palmarinis' individual income tax returns*

A.   *Income*

1.   *Wages, salaries, tips, etc.*

Mr. Palmarini's wage income includes the payments he received from Palmarini Inc. for his labor on the Neshaminy Street garage, *see supra* Part II.D.1.b: $58,100 for 2013 and $76,500 for 2014.

2.   *Constructive dividends from Palmarini Inc.*

The Palmarinis reported $1,344 of dividend income on their 2013 return, and no dividend income for 2014. The Palmarinis' dividend income must include the constructive dividends that Mr. Palmarini received from Palmarini Inc., *see supra* Part II.E: $116,741 for 2013 and

**[\*43]** $62,798 for 2014, *see* § 301(c)(1). This makes the Palmarinis' total dividend income $118,085 for 2013 and $62,798 for 2014.

### 3.     *Other income*

The Commissioner identified deposits into AMOLLC's bank accounts that were not advertising income, and he proposes to reclassify these items as "other" income on the Palmarinis' returns. The Palmarinis reported "other" income of $129,400 on their 2013 return and $71,200 on their 2014 return (listing the type and amount for both years as "1099 MISC-Gambling"). In his revised report, the Commissioner proposes to reduce the Palmarinis' "other" income to $13,750 for 2013 and to $9,108 for 2014. The Palmarinis agree to the Commissioner's determinations and there is no additional amount in dispute.

### B.     *Schedule A casualty loss deduction for 2014*

Section 165 allows a taxpayer a deduction for casualty losses incurred during the year that are not compensated by insurance or otherwise. The amount of the deduction equals the difference between the fair market value of the property before and after the casualty, to the extent of the taxpayer's adjusted basis in the property. Treas. Reg. § 1.165-7(b)(1)(i). Treasury Regulation section 1.165-7(a)(2)(ii) further provides that a deduction for casualty loss may be valued as the cost of repair where (a) the repair is necessary to restore the property to its pre-casualty condition, (b) the cost of repair is not excessive, (c) the repairs do not exceed the actual damage suffered, and (d) the repairs do not increase the value of the property beyond its pre-casualty value. However, section 165(h) limits a deduction for casualty losses in two ways: first by allowing a deduction only for casualty losses greater than $100, *see* § 165(h)(1); and second by allowing a deduction for casualty losses only to the extent that the loss exceeds the sum of the taxpayer's personal casualty gain for the taxable year plus 10% of the taxpayer's adjusted gross income ("AGI"), *see* § 165(h)(2)(A).

The Palmarinis deducted $44,511 for casualty losses on their 2014 return based on the alleged decrease in the value of their home due to the damaged fence. The Commissioner proposes to fully disallow this casualty loss deduction for lack of substantiation of the decrease in the value of the property. We agree that the Palmarinis' casualty loss deduction should be disallowed, but for a reason different from what the Commissioner argues. The Palmarinis claimed their deduction in the amount of what Mr. Palmarini said would have been the cost to replace

[*44] the entire fence, despite his having paid only about $1,000 on repairs of the damaged portion. Assuming his replacement estimate to be correct, that $60,000 expenditure would have given him a brand new fence, not the used fence he owned before the damage was done. There are no receipts reflecting the cost of restoration work actually done, only estimates and Mr. Palmarini's testimony that the value of his property was reduced by having a mismatching fence. Although he put photographs into evidence that do show the damaged fence, there is no appraisal reflecting the extent of the decrease in value of the property as a result of the casualty. *See* Treas. Reg. § 1.165-7(a)(2)(i). The best evidence by which we can quantify the amount of the loss is not the Palmarinis' expenditure of $1,000 (since there is no evidence that these limited repairs were an indication of the lost value), but is instead the insurance company's damage estimate of $3,360, of which the insurance company paid $860 (after a deductible of $2,500) in settlement of the Palmarinis' claim. Because the Palmarinis were thus compensated by insurance to the extent of $860, their net casualty loss for 2014 is the $2,500 "deductible" for which they received no compensation. *See* § 165(h)(2)(A)(i). The Palmarinis are entitled to deduct only the portion of their net casualty loss that is greater than 10% of their AGI, but any AGI amount greater than $25,000 would require the disallowance of the entire $2,500 net loss. The Palmarinis' 2014 AGI (even before inclusion of the amounts determined as income in Part III.A above) is greatly in excess of $25,000, so their casualty loss deduction must be disallowed. *See* § 165(h)(2)(A).

### C.     *Schedule C*

The Palmarinis' Schedules C for 2013 and 2014 reported gross receipts and deducted advertising expenses in excess of those gross receipts, showing a net loss. Although all advertising income and expenses were deposited into and paid out of Palmarini Inc.'s corporate bank accounts, Mr. Palmarini split the reporting of these items between Palmarini Inc.'s returns and the Palmarinis' Schedules C for AMOLLC. He argues that his advertising business belongs on Schedule C because AMOLLC is a distinct business from Palmarini Inc. and because some Forms 1099 reporting advertising revenues were issued to him under his personal Social Security number. Such a division of business activities between an individual and his corporation may sometimes be appropriate, but in this instance it is not supported by the preponderance of the evidence. The amount of advertising income reported on the Forms 1099 that were issued to Mr. Palmarini was marginal compared to the amount of advertising income reported on the

**[\*45]** Forms 1099 that were issued to Palmarini Inc. And even taking as true that Mr. Palmarini intended that those Forms 1099 issued to Palmarini Inc. be issued to him under his personal Social Security number, the income was in fact deposited into Palmarini Inc.'s corporate accounts.

Notably, Mr. Palmarini admitted that his primary objective in preserving his Schedules C was to generate a loss to offset Bernadette Palmarini's wages and reduce the amount of individual income tax owed. This is precisely the kind of manipulative reporting for tax purposes prohibited by the separate entity doctrine of *Moline Properties v. Commissioner,* 319 U.S. at 439 ("[B]ecause the taxpayer had adopted the corporate form for purposes of his own[,] [t]he choice of the advantages of incorporation to do business . . . required the acceptance of the tax disadvantages"). We therefore agree with the Commissioner that all advertising income and expenses must be reported on Palmarini Inc.'s 2013 and 2014 corporate income tax returns, that miscellaneous gross receipts reported on Schedules C must be moved to "other" income on the Palmarinis' 2013 and 2014 returns, and that the remainder of the Palmarinis' Schedule C deductions should be disallowed.

D.    *Schedule E rental properties*

The Palmarinis did not attach a Schedule E to their first amended return for 2013 (the starting point of the IRS's examination for that year).[23] The Palmarinis claimed a $25,000 loss from rental real estate on their 2014 return. The Commissioner initially proposed to limit the Palmarinis' losses on Schedule E to the extent of their passive income. *See* § 469(a), (c), (d). However, in his revised report, the Commissioner determined that the Palmarinis underreported rental income for 2013 and 2014, and that their rental activities produced an overall profit of $5,784 for 2013 and $1,834 for 2014. The parties have stipulated the amounts of rents received, as well as amounts of certain deductible expenses, in 2013 and 2014. To the extent there remain Schedule E deductions in dispute, we will uphold the Commissioner's revised determinations because the Palmarinis did not maintain adequate records and have failed to carry their burden of proving entitlement to deductions in excess of the amounts the Commissioner conceded. However, we will diverge from the Commissioner's revised

---

[23] The Palmarinis did report the income and expenses associated with their rental properties on their second and third amended returns for 2013, but the IRS did not accept them.

[*46] determination regarding the deduction for repairs and maintenance of Chandler Street in 2013.

Expenses for repairs and maintenance may be deducted for the current year only to the extent they are not required to be amortized as capital expenditures. *See* § 263. From the records reviewed by the Commissioner in making his revised determination, we identify $10,340 paid for "repairs and maintenance" to Chandler Street in 2013 and zero in 2014. These expenses were paid by Palmarini Inc. and are included in the constructive dividend Mr. Palmarini received in 2013. To the extent these expenses represent income to Mr. Palmarini through a constructive dividend, we will allow him (as the Commissioner has for other Schedule E deductions) to correspondingly deduct them on Schedule E. However, because the Palmarinis did not maintain adequate records, we do not know whether the work done was ordinary "repair and maintenance" or whether instead it produced a capital benefit to the property that will last for more than one year; nor do we know their adjusted basis in Chandler Street as of 2013. We therefore assume that these 2013 expenditures were capital and that the Palmarinis' adjusted basis in Chandler Street consisted only of these expenditures totaling $10,340, and we will accordingly allow them a $376 deduction for 2013 for depreciation of Chandler Street (based on an adjusted basis of $10,340 depreciated using the straight-line method with a recovery period of 27.5 years). *See* §§ 167(a), (c), 168(a), (b), and (c).

E.    *Section 6662 accuracy-related penalties*

For an individual (as for a corporation, discussed above), the section 6662(a) and (b)(1) and (2) accuracy-related penalty applies to the portion of an underpayment of tax required to be shown on a return that is attributable to either (1) the taxpayer's negligence or disregard of rules or regulations or (2) a substantial understatement of income tax, defined for an individual by section 6662(d)(1)(A) as exceeding either 10% of the tax that should have been reported on the return or $5,000, whichever is greater.

The Commissioner bears the burden of production with respect to the liability of an *individual* for any penalty. § 7491(c). To satisfy his burden, the Commissioner must present sufficient evidence to show that it is appropriate to impose the penalty in the absence of available defenses. *See Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). One element of the Commissioner's burden of production is to show

**[\*47]** compliance with section 6751(b)(1), which requires the individual making the penalty determination to obtain written supervisory approval of the initial determination to assert any penalty. *See Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). Once the Commissioner meets his burden of production on penalties, the taxpayer must come forward with persuasive evidence that the Commissioner's showing is incorrect. *Higbee*, 116 T.C. at 447; *see also* Rule 142(a). Or he may defend against the penalty with a showing of "reasonable cause" and "good faith" under section 6664(c)(1).

Here the Commissioner showed that Agent Berntsen received supervisory approval to assert the section 6662 accuracy-related penalty before sending to the Palmarinis the 30-day letter containing her proposed report (which was the first formal communication of the penalty determination to the Palmarinis) and has satisfied his burden of production to show compliance with the supervisory approval requirements of section 6751(b)(1).

We are satisfied (as with Palmarini Inc.) that the Palmarinis are liable for section 6662 accuracy-related penalties for 2013 and 2014 under either a negligence theory based on their failure to maintain adequate records or on a substantial understatement theory based on the extent of their underreported income and overstated deductions. Furthermore, the Palmarinis have not shown any "reasonable cause", *see* § 6664(c); Treas. Reg. § 1.6664-4, that would justify relief from the section 6662 accuracy-related penalties.

IV.  *Conclusion*

The Commissioner's revised determinations are sustained in part, to the extent set out above. To reflect the parties' concessions and the foregoing,

*Decisions will be entered under Rule 155.*

[*48]                           APPENDIX

## Constructive dividends from Palmarini Inc. to
## Benito Palmarini in 2013 and 2014

The following is an itemization of the amounts Benito Palmarini received as constructive dividends from Palmarini Inc. in 2013. (The Commissioner's greater total is itemized on his Exhibit 79–R.)

| Description | Amount |
|---|---|
| Bartons Carpet (renovation work) | $1,558 |
| Ben Palmarini | 9,000 |
| Brener Heating & Air Conditioning (renovation work) | 4,000 |
| Fred Morning (rental mowing) | 4,677 |
| Jerry Toscano (renovation work) | 5,568 |
| Kevin Burcz (lawnscaping) | 3,375 |
| Magazine Center for Wellness (medical expenses for Benito) | 16,075 |
| McCafferty Ford (personally owned truck) | 1,848 |
| Michael Russo (worked on rental properties) | 58,000 |
| Michael Smyth | 10,340 |
| Paul Weiss (electrician-Neshaminy rental property) | 2,300 |
| Total | $116,741 |

[*49] The following is an itemization of the amounts Benito Palmarini received as constructive dividends from Palmarini Inc. in 2014. (The Commissioner's greater total is itemized on his Exhibit 80–R.)

| Description | Amount |
| --- | --- |
| AMEX card #0-51007 (European cruise for family) | $14,979 |
| Ben Palmarini | 11,874 |
| Jerry Toscano | 9,733 |
| Jessica Palmarini (daughter) | 110 |
| Kevin Burcz (lawn maintenance for properties) | 3,610 |
| Magazine Center for Wellness (medical expenses for Benito) | 5,055 |
| McCafferty Ford (personally owned truck) | 103 |
| Michael Russo (worked on rental properties) | 2,468 |
| Michael Smyth | 10,000 |
| Reinard Agency (insurance company for rental properties) | 4,490 |
| VW of Langhorne (daughter's car) | 376 |
| Total | $62,798 |